Diane Y. WASHINGTON,
Plaintiff–Appellant,

v.

H. Lawrence GARRETT, III, Secretary
of the Navy, Defendant–Appellee.

No. 92–55124.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 1993.

Decided Nov. 5, 1993.

As Amended on Denial of Rehearing
Jan. 26, 1994.

Diane Y. Washington, pro se.

Katheryn A. Snyder, Asst. U.S. Atty., San Diego, CA for defendant-appellee.

Before FLETCHER, POOLE, and THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

Diane Washington appeals pro se the district court's order granting partial summary judgment to the government and dismissing the remainder of her suit asserting claims of unlawful personnel practices and employment discrimination against the Navy. Because Washington alleges triable claims with respect to her separation from the Navy, we reverse in part the district court's grant of summary judgment.

## FACTS AND PROCEDURAL HISTORY [1]

From November 1986 to July 1988, Diane Washington, an honorably discharged Vietnam veteran, was employed as a Public Affairs Specialist at the Naval Training Center in San Diego, California. It was her job to edit *The Hoist*, the base newspaper. In that capacity, she distributed writing and photographic assignments and oversaw the layout and printing of the paper. Washington's civilian editorial position was classified as GS–9.

Initially, Washington worked with five other employees in the Public Affairs Office: Barton D. Buechner, Public Affairs Officer; Deborah Browning, Assistant Public Affairs Officer; Patricia Neal, Chief Journalist; Steven Hendrickson, Staff Writer; and Shannon Trahan, Secretary. Washington was the only black employee. She reported to Buechner, who headed the office. Buechner and Neal were active-duty Navy officers.

In 1987, Assistant Public Affairs Officer Browning left without a replacement and her duties were assumed by Neal. Hendrickson also left; his job was taken over by a new staff writer, Sharron Norrod, who was white. In January 1988, Trahan, the secretary, resigned, and was not replaced. Trahan's duties were absorbed by the remaining staff.

After these personnel changes, a divisive atmosphere prevailed in the Public Affairs Office. In particular, Washington and Norrod did not get along. According to Washington, Norrod, with the backing of Buechner and Neal, refused to take directions and acted in a generally insubordinate manner. Overall, Washington contends, she was subjected to discriminatory and harassing treatment at the hands of her coworkers.

On February 1, 1988, Buechner gave Washington a written and oral performance review. In the written evaluation, Washington was rated as outstanding in each of four categories. The review contained such praise as, for example.

> Ms. Washington has maintained tight control over the publication of the HOIST since becoming editor in November, 1986. The paper is distributed on time each Friday to a large and diverse constituency, including targeted mailings to special audiences. She demands and enforces high standards of professionalism from the [printing] contractor, and assures that the product is the best possible.

Although he signed the written review, Buechner gave Washington a considerably less favorable oral evaluation. According to Buechner, at this meeting, he told Washington that she needed "to improve in the areas of interpersonal communication, teamwork, delegation skills, and overall demeanor." The next day, February 2, Washington reported for work but then walked off the job. She later secured a doctor's note which indicated that she was suffering from job-related stress and that she intended to return to work after her recovery.

Shortly after Washington's departure, Buechner assigned Neal to take over the editorial responsibilities of the paper. Buechner claims to have decided in the next few days that the office "ran more smoothly" without Washington. Sometime before February 9, he contacted the Naval Training Center's Chief of Staff, P.M. Reber, to arrange to have Washington's position abolished through a reduction in force ("RIF") action. During their discussion of the proposed RIF, Buechner expressed concerns to Reber about Washington's behavior. Reber responded to Buechner with a memorandum which stated:

---

1. These facts are drawn from various sources in the record. Except as otherwise indicated, they are undisputed.

1. In response to severe budget reductions there are decreased funds available for civilian personnel. While it is recognized that the HOIST serves a vital function at this command, it is no longer feasible to maintain a GS–9 employee solely for the purpose of editing this publication.

2. In accordance with your earlier temporary arrangements, JOC Neal is to assume responsibility for editing the newspaper....

3. I regret that this action is necessary....

4. By copy of this memorandum, the Civilian Personnel Office is directed to take action to abolish subject position, and make appropriate arrangements with regard to the incumbent.

Washington's was the only position to be affected by the RIF.

At about the same time as the command's approval of the elimination of Washington's position ostensibly for budgetary reasons, Buechner was informed by the agency's comptroller that it would be possible to hire a new secretary and another staff writer. Meanwhile, it appears that Reber sought the advice of the station's civilian personnel office concerning the effects of the reorganization on Washington's job rights.

On February 24, while Washington was still on sick leave, she and her union representative met with Buechner to discuss her return to work. Notwithstanding the significant steps Buechner had already taken behind the scenes toward the elimination of Washington's editorial position, he agreed that Washington could eventually resume her editorial role when she returned from sick leave. The memorandum of agreement from this meeting provided that Washington would come back to work on March 7 as a staff writer, but would not be downgraded, and would "work gradually for a period not to exceed thirty (30) days back into the full performance of her [editorial] duties."

Intraoffice politics did not improve upon Washington's return to the Public Affairs Office on March 7. Washington's name was written in last on the office sign-out board, below Norrod's and the new secretary's, even though everyone else was listed in rank order. She claims that an office partition had been moved so that her office space was reduced to approximately one-quarter the size of the space occupied by Norrod. Apparently at Buechner's direction, the word "staff" was added to Washington's usual byline, while every other writer was identified merely by name and naval office. Washington viewed the altered byline as an attempt to lower her status. In late March, Neal drafted a memorandum which, according to Washington, authorized everyone on the Public Affairs staff to pick up office mail except her. Finally, according to Washington, on March 21, Buechner extended her staff writing detail for an additional 120 days, reassuring her that it was only temporary and that no RIF was being contemplated.

On or about April 5, Norrod filed an informal Equal Employment Opportunity ("EEO") Complaint against Washington. Norrod alleged that Washington had remarked to her, "When you're little and cute and white, you get your way." Washington responded by filing her own informal EEO complaint on April 6, in which she listed numerous acts of perceived harassment on the part of Norrod and others before and since her return to the office, some of which are described above. On May 3, Washington filed a formal EEO complaint against the Naval Training Center alleging race and sex discrimination (the "May 3 complaint").

Three days later, on May 6, Washington received a RIF notification which informed her that her GS–9 editorial position was being abolished as part of a "realignment" of the Public Affairs Office. The stated goal of the reorganization was to "reduce the higher level structure and to better conform with the most essential portions of the missions and functions of the office." The notice continued,

A retention register has been prepared which gives full consideration to veteran's preference, civil service tenure, length of Federal Service and performance ratings. The retention rights of all employees have been checked and it has been determined that your best offer is that of Change to Lower Grade to a newly established posi-

tion of Writer, GS–1082–07. If you accept this offer, the Change to Lower Grade will be effective 12 JUNE 1988 and your last day of active duty in your present position will be 10 JUNE 1988.

Washington was instructed to respond by May 13 if she wanted to accept the GS–7 writer position or she would be separated on June 10. The notice further stated that the RIF "[did] not reflect on [Washington's] service or conduct" and that the necessity of an office realignment was the "sole reason" for the action taken. Appended to the notice was additional information indicating that, notwithstanding the RIF, Washington would be treated for pay purposes as a GS–9 for two years and, with certain conditions, was eligible to retain the same rate of pay, though with more limited salary increases, even after that two-year period.

Also appended to the RIF notification was job placement information indicating that Washington, as a career employee, would be included in the Navy's Reemployment Priority List ("RPL") and was entitled to be registered in the Department of Defense ("DOD") Priority Placement Program ("PPP"). These are mechanisms whereby civilian workers who have been separated as a result of a RIF receive special or priority consideration for reemployment.

Sometime after the RIF was effected, Buechner prepared a memorandum purporting to explain his reasons for taking the actions he did.[2] In it, Buechner catalogued perceived shortcomings on Washington's part and concluded with the observation that he felt compelled to remove Washington's editorial responsibilities because of her "failure to maintain appropriate standards of conduct."

On June 27, Washington filed another formal EEO complaint alleging that the RIF action was the result of race and sex discrimination and in reprisal for the previous discrimination complaint she had filed (the "June 27 complaint").

Washington declined the offer to rejoin the Public Affairs Office as a GS–7 staff writer. She was separated effective July 1.[3] Although there is a dispute as to whether the Navy followed proper procedures in adding Washington to its RPL, the parties agree that Washington was included in the Navy's RPL by August 8 and was listed as qualified for GS–9 and GS–11 positions at Department of Navy activities in the San Diego commuting area. A December 1988 letter from the Navy's Civilian Personnel Office indicates that while Washington initially was also considered eligible to be included in the PPP by virtue of having been subject to a RIF, she was later rejected from the program when it was learned from an unspecified source that her "recent conduct on the job" was "an issue."

Between mid-June and mid-July 1988, the Naval Aviation Depot at North Island ("North Island") in San Diego advertised the position of Supervisory Public Affairs Specialist, classified as GS–11/12. Washington, who apparently understood that she was to receive automatic consideration for Naval positions in the San Diego area, never independently applied for this job. In fact, those responsible for filling it had never heard of her at the time the hiring decision was made. The individual selected for the position was a white male who transferred laterally at a GS–12 level from a similar position in the Army. Washington appealed her nonselection to the Merit Systems Protection Board ("MSPB" or "Board"), claiming that her reemployment rights had been violated and that she had been discriminated against on the grounds of race and sex (the "GS–11/12 case or claim").

On August 25, Washington filed a third formal EEO complaint (the "August 25 complaint"), this one asserting that Buechner, with discriminatory intent, had issued a false document for the purpose of damaging her career.[4]

---

**2.** It is not clear to whom this document was originally addressed, although it was eventually submitted to the MSPB.

**3.** This was slightly later than the date set in the RIF notice.

**4.** It is not clear from the record to which document she referred.

Another public affairs position in the North Island facility, at the GS–7/9 level, became available in the spring of 1989. Washington was interviewed for this job. She asserts, however, that she was seen only after she insisted that she be considered and after the hiring decision had already been made. The woman appointed to this position was a white female who was promoted into the GS–9 level from her previous GS–7 position at another San Diego Naval facility. Washington again appealed her nonselection to the MSPB, contending as before that her reemployment rights had been violated and that she had been discriminated against on the basis of her race and sex (the "GS–7/9 case or claim").

An EEO officer conducted a joint investigation of Washington's May 3 and June 27 complaints, and issued a finding of no discrimination.[5] On October 4, Washington filed a petition with the MSPB challenging the propriety of the RIF on the grounds that it had not been a bona fide action, was discriminatorily motivated, and constituted an illegal reprisal for her protected EEO activities (the "RIF case or claim"). Thus, at this stage, Washington had three appeals pending before the Board: the GS–11/12 and GS–7/9 claims, concerning alleged violations of her reemployment rights, and the RIF claim. Each of these was what is referred to as a "mixed case," in that each alleged both an illegal employment action and at least one act of discrimination.

After full board review, the MSPB ruled against Washington in all three matters. Washington sought further review of the discrimination component of each case before the EEOC, which in May 1990 upheld the Board's findings of no discrimination with respect to Washington's RIF and GS–11/12 claims.[6]

In June 1990, Washington filed three complaints in district court in which she sought judicial review of the three adverse agency rulings.[7] Washington subsequently filed a first amended complaint in the GS–7/9 case which effectively combined the three pending cases into a single Title VII action.[8] Although it appears from the record that the matters were never officially consolidated, after the filing of the amended complaint, the court seems to have treated them together as one case involving three distinct causes of action.[9] In December 1991, after the parties had conducted a substantial amount of discovery, the district judge upheld the magistrate judge's partial denial of Washington's motion to compel the production of various documents.

In January 1992, in an oral decision, the district judge granted the government's motion for summary judgment as to the RIF claim, concluding that Washington had failed to rebut the Navy's contention that the reorganization had been a legitimate cost-cutting measure. The court further held that Washington had failed to produce evidence to support her allegations that the RIF was a mere pretext for discrimination and in reprisal for her protected EEO activities. The court granted summary judgment to the government as well on the GS–11/12 claim, ruling that under applicable regulations, the Navy had not violated Washington's reemployment rights by hiring the GS–12 candidate over her, and further, that Washington had failed to make any showing of discrimination in connection with the hiring decision. Because Washington had failed to file her complaint in the GS–7/9 case within thirty days of the

5. It is unclear whether an EEO investigation was ever completed with respect to the August 25 complaint. At a subsequent stage of the proceedings, Washington formally withdrew the May 3 and August 25 complaints.

6. It appears that the EEOC never issued a decision with respect to the GS–7/9 claim.

7. The complaints in the RIF and GS–11/12 cases were timely. For reasons discussed below, however, Washington's complaint in the GS–7/9 case was not timely filed.

8. Although Washington briefly retained counsel in connection with the filing of this amended complaint, she appeared *pro se* throughout the bulk of the proceedings in the district court.

9. Washington's first amended complaint also contains an allegation apparently never raised before the MSPB, that her veteran's preference rights were violated when the Navy failed to rehire her. Since this claim was not administratively exhausted and the district court never ruled on it, we decline to address it on appeal.

MSPB's final order, the court dismissed that claim as time-barred.

As the next step in a labyrinthine administrative and judicial review process, Washington has timely appealed to this court the grant of summary judgment on the RIF and GS–11/12 claims, the dismissal of the GS–7/9 claim, and the partial denial of her motion to compel discovery.

## JURISDICTION AND STANDARDS OF REVIEW

A "mixed case" brought under 5 U.S.C. § 7703(b)(2) is one which involves both a personnel action normally appealable to the MSPB and a claim of discrimination. *Vinieratos v. United States, Dep't of Air Force,* 939 F.2d 762, 766 n. 2 (9th Cir.1991); *Romain v. Shear,* 799 F.2d 1416, 1419 (9th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 840 (1987); *see also* 5 U.S.C. § 7702(a) (authorizing Board to decide discrimination claim along with the normally appealable claim), 7703(b)(2) (providing for judicial review of Board's decisions in mixed cases). While only the Court of Appeals for the Federal Circuit can review MSPB decisions in cases that do not entail discrimination claims, if a case is a mixed one, judicial review must be sought in district court under the applicable discrimination statute. *Romain,* 799 F.2d at 1420 n. 1, 1421. Under the mixed case scenario, the district court has jurisdiction to review the lawfulness of the personnel action as well as the discrimination claim. *Id.*

Upon reaching district court, the complainant is entitled to trial de novo on her discrimination claim. 5 U.S.C. § 7703(c); *Romain,* 799 F.2d at 1421. The nondiscrimination claim, however, is reviewed by the district court under a more deferential statutory standard. 5 U.S.C. § 7703(c); *Romain,* 799 F.2d at 1421. The decision of the MSPB concerning the validity of the personnel action is not to be set aside unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *Lindahl v. Office of Per-*

*sonnel Management,* 470 U.S. 768, 774 n. 5, 105 S.Ct. 1620, 1624 n. 5, 84 L.Ed.2d 674 (1985).

We review the propriety of the district court's grant of summary judgment de novo. *Saul v. United States,* 928 F.2d 829, 832 (9th Cir.1991). As to the discrimination claim, we must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir. 1993). At the summary judgment stage, the district court is not to weigh the evidence or determine the truth of the matter but should only decide whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Our role with respect to the nondiscrimination claims is to determine whether the district court was correct in upholding the MSPB's decision. We review the Board's order to make sure that the Board applied the correct legal standards and the entire administrative record to ascertain whether its findings are supported by substantial evidence. *Young v. Sullivan,* 911 F.2d 180, 183 (9th Cir.1990). In conducting our review, we must consider evidence in the record that undermines as well as that which supports the Board's decision. *Baxter v. Sullivan,* 923 F.2d 1391, 1394 (9th Cir.1991).

The district court's dismissal on statute of limitations grounds presents a question of law that we review de novo. *Donoghue v. The County of Orange,* 848 F.2d 926, 929 (9th Cir.1987).

Finally, "[t]he scope of discovery is within the discretion of the district court and we review for an abuse of that discretion." *United States v. Taghipour,* 964 F.2d 908, 910 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 283, 121 L.Ed.2d 210 (1992).

## DISCUSSION

### A. The RIF

We turn first to the claims surrounding the elimination of Washington's editorial position through the RIF action.

### 1. *Bona fides*

 Washington asserts that the RIF constituted an unlawful personnel action because it was personal to her and not a bona fide workforce reduction. The district court concluded that the record adequately supported the Navy's contention that the RIF was a legitimate reorganization of the Public Affairs Office.

#### a. *Relevant law*

Under applicable civil service regulations, the permissible justifications for a RIF are: lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position d[ue] to erosion of duties. 5 C.F.R. § 351.201(a)(2);[10] *Losure v. Interstate Commerce Commission*, 2 M.S.P.B. 361, 363, 2 M.S.P.R. 195, 199 (1980). A reorganization is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203; *Mead v. Merit Sys. Protection Bd.*, 687 F.2d 285, 286 (9th Cir.1982).

 A reduction in force may not be used as a disguise for an adverse action to remove or demote a particular employee. *Gandola v. Federal Trade Commission*, 773 F.2d 308, 312 (Fed.Cir.1985). "[I]f an employee is removed through a reduction in force because of dissatisfaction with his performance, the reduction in force is improper with respect to that employee...." *Id.; see also Liguori v. United States Military Academy*, 4 M.S.P.B. 100, 101, 4 M.S.P.R. 6, 7 (1980) (same). In other words, a RIF may not be undertaken "for reasons personal to the employee." *Mead*, 687 F.2d at 286; *Liguori*, 4 M.S.P.B. at 101, 4 M.S.P.R. at 7.

In *Losure v. Interstate Commerce Commission*, a leading decision in this area, an existing employee's position was abolished after a new employee took over her functions. The Board refused to sustain the agency's "restructuring":

The term "reorganization," while broad enough to cover a multitude of legitimate management considerations, is not a magic word whose incantation can justify use of RIF actions to circumvent an employee's procedural rights....

. . . .

An "open expression of dissatisfaction" is not necessary to a finding of improper agency motivation. Even if personal animus were required, it might be inferred here from circumstantial evidence.... This bureaucratic version of the old shell game, in which the victim ends up with no job because the duties have been slipped under a new shell (position) but nothing of substance has changed, may alone be enough to raise an inference of improper motivation—at least when combined with other circumstances such as those present here.

2 M.S.P.B. at 363–64, 2 M.S.P.R. at 199–200 (footnote omitted).

#### b. *Review of record*

In Washington's case, the Board upheld the ALJ's finding that the RIF was effected to increase office efficiency and "with a view toward long-term monetary savings." M.S.P.B. Opinion and Order at 3. The Board's order acknowledged that the Navy was not fully satisfied with Washington's performance prior to her separation, but affirmed the ALJ's determination that "the agency's actions toward appellant were inconsistent with any intention to use RIF procedures to circumvent the appellant's adverse action rights." *Id.* The ALJ, in turn, relied heavily on the testimony of Reber, which she considered more credible than that of Washington, in rendering her factual findings.[11] Her decision also cites a bulletin issued by higher command in March of 1988 indicating that the Navy was restricting new hires due to funding limitations.

Reber's testimony was, viewed in its best light, equivocal. While maintaining on the one hand that he "wasn't aware of any prob-

---

10. All citations to the Code of Federal Regulations are to the January 1, 1988 edition that was in effect at the time of the actions complained of by Washington.

11. Buechner did not testify.

lems with Ms. Washington's conduct when [h]e made the decision to abolish her position," Reporter's Transcript of hearing before ALJ, at 415–16, and that "[s]he hadn't done anything that [he] knew of when the decision was made," *id.* at 390, Reber admitted on the other hand that at the time he approved the RIF, he understood that Washington's performance was "in question" and "needed readjust[ing]," *id.* at 395–96. He conceded that had Washington not walked off the job on February 2, it was "possible" that she would have retained her editing job on *The Hoist. Id.* at 413.[12]

Reber stated that he had decided to abolish Washington's position for fiscal reasons and out of concern for office efficiency. According to Reber, the higher command had directed him to review his civilian staff in light of the funding shortage. But he also acknowledged the accuracy of the EEO officer's finding that two new civilian positions in the Public Affairs Office were budgeted at the same time he eliminated Washington's job and that Washington would have remained at the same pay level for a period of years had she accepted the newly created writer position.

Significantly, the sole document produced by the Navy to corroborate Reber's budgetary justification postdates Reber's February 9 approval of the RIF. While the March 1988 bulletin indicates that the Navy was trying to cut its civilian personnel budget through attrition and more prudent hiring, it also notes that this approach was "in lieu of a ... hiring freeze or directed RIF furlough actions." It thus does not lend much support to Reber's claim that the abolishment of Washington's position was in response to a directive from above.

■ An ALJ's findings as to credibility are entitled to considerable deference. *Curran v. Department of the Treasury,* 714 F.2d 913, 915 (9th Cir.1983). But "[w]hile it is true that ordinarily the question of credibility is left to the [ALJ], this is not an inflexible rule and will not be enforced if the credibility determination is inherently improbable or discredited by undisputed fact." *Grubka v. Department of the Treasury,* 858 F.2d 1570, 1574 (Fed.Cir.1988) (reviewing MSPB decision). Here, the inconsistencies in Reber's explanation and his failure to demonstrate the fiscal necessity or benefits of the action he took render his account inherently unbe-

---

**12.** The dissent suggests that the majority's use of Reber's testimony is selective. It, in turn, quotes from Reber's testimony to prove its point. We suggest that if the passage quoted by the dissent at page 12639 had been quoted in full, it would further substantiate the majority's position that the RIF was personal to Washington. Following is the dissent's quote augmented by the portions it omitted which we have underlined:

Q: Did lieutenant Buechner discuss Ms. Washington's performance or conduct with you?
A: Only in the—well, yes, to the fact that she had asked—her behavior in the morning was of rather a shock to him.
He ha[d] spoken with her the day before about her evaluation of her performance which was the routine time to do so, and in the course of doing so her performance evaluation was satisfactory and I don't believe there was anything that he had had [sic] found a particular fault in her evaluation, and during the time—during the counseling he told me that he did have some criticism of some of the things that he wanted to add to the evaluation as part of his counseling.
And he told her that there were some things that he wanted to improve or something, that her performance needed readjusted [sic] or whatever.

And then, as far as her reaction was fine and put that on board as in the sense that it was meant, I assume.
But then late that evening at night he was rather surprised and said that he got a call from Ms. Washington at 11:00 o'clock that night and she was very upset and distraught over the comments that he'd made to her during her evaluation which she had not given any indication at the time that she was upset.
And then the next morning came in and said she quit. So in that sense, yes, he discussed her behavior.
Q. Okay. Her behavior and not her performance?
A. Well—
Q. Was her performance ever in question?
A. Not more than any—yes, I suppose in the sense that he had some criticism of it.
Q. Performance or conduct?
A. Oh, I don't remember. I remember that he said whatever his comments were and I remember asking, "Well, what is it that you said to her?" And he said, "Well, just routine things kind of," and I don't know if I could define the difference between conduct and performance, but I guess they were performance. I don't remember.
Reporters Transcript of Hearing at 395–96.

lievable. Furthermore, his testimony is sharply contradicted by more reliable evidence in the administrative record, including the memorandum in which Buechner detailed the alleged shortcomings on the part of Washington that led him to remove her editorial responsibilities and the letter informing Washington she was determined to be ineligible for inclusion in the DOD's placement program because her performance had been called into question.

Buechner's plan was effectively to demote Washington to a writer position at the same rate of pay and to add a secretary to the office. The Navy has never explained how this could have resulted in decreased personnel expenditures. Furthermore, it is not clear how the reorganization could have been considered more efficient, since greater efficiency implies increased productivity with the same number of people or the same level of productivity with fewer people. Buechner's restructuring of the Public Affairs Office contemplated neither.

In sum, all the credible evidence in the record indicates that the RIF was effected for reasons personal to Washington.[13] In dismissing Buechner's and Reber's admitted dissatisfaction with Washington as inconsequential, the Board disregarded well-established law.

Pursuant to 5 U.S.C. § 7703(c), we must set aside a Board decision that is not in accordance with applicable law or is not supported by substantial record evidence. *See Lindahl v. Office of Personnel Management,* 470 U.S. 768, 774 n. 5, 105 S.Ct. 1620, 1624 n. 5, 84 L.Ed.2d 674 (1985). The Board's determination that the RIF was a bona fide action is deficient in both of these respects. We therefore reverse the district court's grant of summary judgment to the Navy on this aspect of the case. Because the Navy's action was illegal, we remand this portion of the case to the Board with instructions to order the Navy to reinstate Washington to her GS–9 editorial position at the Naval Training Center with back pay and benefits. *See Wright v. Department of Transp.,* 900 F.2d

1541, 1545–46 (Fed.Cir.1990) (where FAA failed to establish that air traffic control trainee was properly removed from program, case remanded to Board with instructions to order FAA to reinstate trainee with back pay and benefits); *Grubka,* 858 F.2d at 1576 (remanding to MSPB with instructions to restore complainant to former position with back pay and benefits upon determination that ALJ's decision sustaining personnel decision was not supported by substantial evidence and was erroneous as a matter of law); *see also Curran,* 714 F.2d at 918 (ordering reinstatement of employee where substantial evidence did not support MSPB's conclusion that he was transferred for legitimate reasons).

### 2. *Discriminatory animus*

Washington contends that the reorganization in which she lost her job was a pretense for race and sex discrimination and in reprisal for protected EEO activities. The district court concluded that

> [t]he public affairs office was a small office, consisting of only five employees, and the editorial functions were transferred to the assistant public affairs officer, a white female. The Plaintiff has not presented sufficient facts that the reorganization was merely a pretext to allow Defendant to intentionally discriminate against the Plaintiff. Further, the Department offered the Plaintiff a new position in the reorganized office, but the plaintiff refused the offer.

(Reporter's Transcript of 1/6/92 at 29–30.)

#### a. *Race discrimination*

■ We cannot agree with the district court that Washington has failed to meet her burden on summary judgment as to her allegation of race discrimination in connection with the RIF.

■ Although her complaint does not specify a particular theory of discrimination, in her summary judgment papers, Washington refers to the alleged discrimination as disparate treatment.[14] A claim of disparate

---

13. We express no opinion as to whether the dissatisfaction with Washington was justified.

14. On appeal, Washington also asserts that the Public Affairs Office was a "hostile working envi-

treatment requires direct or circumstantial proof of discriminatory motive. *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir.1988). In order to prevail in such a case,

> a plaintiff must first establish a *prima facie* case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision. If the defendant carries its burden, the plaintiff is afforded an opportunity to demonstrate that the " 'assigned · reason'

was 'a pretext or discriminatory in its application.' "

*Diaz v. American Tel. & Tel.*, 752 F.2d 1356, 1358–59 (9th Cir.1985) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 807, 93 S.Ct. 1817, 1827, 36 L.Ed.2d 668 (1973)).[15] The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff, however, " 'remains at all times with the plaintiff.' " *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), (quoting *Texas Dep't of Community*

---

ronment," thus invoking an alternative theory under Title VII. A hostile work environment is shown by "the existence of severe or pervasive and unwelcome verbal or physical harassment because of plaintiff's membership in a protected class." *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir.1991); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 2404–2405, 91 L.Ed.2d 49 (1986) (discussing elements of hostile environment).

The Supreme Court has instructed federal courts to construe liberally "inartful pleading" by pro se litigants. *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir.1987) (quoting *Boag v. Mac-Dougall*, 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982)). Though it appears Washington did not make explicit reference to the hostile environment theory in district court, she did, throughout the proceedings below, emphasize that she had been subjected to an overall campaign of harassment by her coworkers, the hallmark of a hostile working environment claim. Because the district court did not expressly rule on this facet of Washington's case and the government did not brief its merits on appeal, we leave it to the district court on remand to determine in the first instance whether Washington has alleged facts sufficient to present a triable claim of discrimination under a hostile environment theory.

**15.** A somewhat different approach has developed for cases in which the plaintiff alleges that both legitimate and discriminatory motives played a role in the disparate treatment. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Sischo–Nownejad*, 934 F.2d at 1110. In evaluating such a "mixed motive" case, it "makes no sense to ask" whether the legitimate reason was pretextual. *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788. Thus, in a mixed motive case, the plaintiff is required to demonstrate "that it is more likely than not that a protected characteristic 'played a motivating part in [the] employment decision.' " *Sischo–Nownejad*, 934 F.2d at 1110 (quoting *Price Waterhouse*, 490 U.S. at 244, 109 S.Ct. at 1787).

The Civil Rights Act of 1991 modified the Supreme Court's holding in *Price Waterhouse* as to when a plaintiff is entitled to relief in a mixed motive case. *Price Waterhouse* held in part that an employer could avoid liability for intentional discrimination in a mixed motive case if it could demonstrate that the same action would have been taken even if the illegitimate motive had played no role in the employment decision. 490 U.S. at 244–45, 109 S.Ct. at 1787–88. As amended by the 1991 Act, Title VII now provides that a plaintiff establishes an unlawful employment practice "when [she] demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m), *added by* Civil Rights Act of 1991, Pub.L. No. 102–166, § 107(a), 105 Stat. 1071, 1075 (1991); *see also Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n. 2 (9th Cir.1993). Under the 1991 amendments, however, if an employer is able to establish that the same action would have been taken in the absence of the illegitimate motive, the court is limited in the types of relief it may order. *See* Civil Rights Act of 1991, Pub.L. No. 102–166, § 107(b), 105 Stat. 1071, 1075–76 (1991) (codified at 42 U.S.C. § 2000e–5(g)(2)(B)).

A plaintiff need not label her case a single or mixed motive case from the beginning. "[I]ndeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both.... At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives." *Price Waterhouse*, 490 U.S. at 247 n. 12, 109 S.Ct. at 1788 n. 12.

Washington apparently did not specify in district court whether she also seeks to establish that the Navy's elimination of her position stemmed from mixed motives—that is, a legitimate managerial concern combined with unlawful discrimination—and the district court did not rule on this alternate theory. Since her allegation of race discrimination might also be analyzed under the mixed motive approach, on remand the district court should determine whether Washington also wishes to proceed under a mixed motive theory, and, if so, whether such an approach is viable in her case.

*Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

 The burden on summary judgment of a plaintiff asserting disparate treatment under Title VII is thus to establish a *prima facie* case of discrimination and, if the employer articulates a legitimate, nondiscriminatory reason for its actions, to raise a genuine factual issue as to whether the articulated reason was pretextual. *Sischo–Nownejad v. Merced Community College,* 934 F.2d 1104, 1109–10 & n. 7 (9th Cir.1991) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (1973)). If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed.

This approach is in accord with the Supreme Court's recent decision in *St. Mary's Honor Center.* The *St. Mary's* majority held that, even when the plaintiff is successful in demonstrating, pursuant to the *McDonnell Douglas* framework, that the employer's proffered reason is pretextual, the factfinder is not compelled to render a finding of unlawful discrimination. The opinion makes clear, however, that the factfinder *may* infer discrimination from the showing of pretext:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the employer's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and … upon such rejection, "no additional proof of discrimination is required."

*St. Mary's Honor Ctr.,* —— U.S. at ——, 113 S.Ct. at 2749 (quoting opinion below, *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 493 (8th Cir.1992)) (citation and footnote omitted).

Because, as *St. Mary's* recognizes, the factfinder in a Title VII case is entitled to infer discrimination from plaintiff's proof of a *prima facie* case and showing of pretext without anything more, there will always be a question for the factfinder once a plaintiff establishes a *prima facie* case and raises a genuine issue as to whether the employer's explanation for its action is true. Such a question cannot be resolved on summary judgment. *But see St. Mary's Honor Ctr.,* —— U.S. at ——, 113 S.Ct. at 2762 (Souter, J., dissenting).

 A plaintiff establishes a *prima facie* case under Title VII by introducing evidence that gives rise to an inference of unlawful discrimination. *Sischo–Nownejad,* 934 F.2d at 1109. One way to accomplish this is through indirect evidence, by invoking the classic *McDonnell Douglas* formulation. *St. Mary's Honor Ctr.,* —— U.S. at ——, 113 S.Ct. at 2747. In *McDonnell Douglas,* the Supreme Court held that a plaintiff can make out a *prima facie* case under Title VII by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

The plaintiff in *McDonnell Douglas* was an unsuccessful job applicant. Recognizing, however, that the four-part test established in that case is "not intended to be an inflexible rule," *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 575, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), courts have adapted it to a variety of other employment contexts. *Cf. McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification … of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect in differing factual situations.")

 The Ninth Circuit has yet to set forth the criteria for a circumstantial *prima facie* case when the employment action in question is a RIF. We have previously acknowledged, however, that when an employee alleges that her position was abolished for discriminatory reasons, the fact that she was not replaced by someone not of her protected class is not fatal to her claim. *Palmer v. United States,* 794 F.2d 534, 537 (9th Cir.

1986); *Haydon v. Rand Corp.*, 605 F.2d 453, 454 n. 1 (9th Cir.1979). In keeping with our prior determination, we agree with the Third Circuit that, in a case in which it is alleged that a RIF was carried out in a discriminatory fashion, the plaintiff may establish her *prima facie* case by demonstrating: (1) that she belongs to a protected class; (2) that she was discharged from a job for which she was qualified; and (3) that others not in her protected class were treated more favorably. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 60 (3d Cir.1988); *cf. Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1475 (7th Cir.1993); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 104 (2d Cir.1989).

Washington has made out a *prima facie* case of employment discrimination under the above test. She was qualified for the position she held and was the only black person, indeed the only person, to lose her job in the RIF. Others in the Public Affairs Office were treated more favorably, including the white woman who took over Washington's editorial responsibilities at the *Hoist.*

We note that Washington has also presented some direct evidence of race discrimination in that she has shown that an atmosphere of racial tension existed in the office during the period in which Buechner was negotiating to eliminate her position. This evidence strengthens, but is not necessary to, her circumstantial case.[16] Although it is not apparent from the record who was responsible for the hostilities, on summary judgment, the evidence must be viewed in the light most favorable to Washington. It thus lends support to her claim of racial animus.

In response to Washington's *prima facie* case, the Navy again invokes the "severe" economic constraints cited in Reber's memorandum and the office efficiency rationale given in the RIF notice. We note that, in the ordinary case, such fundamentally different justifications for an employer's action would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason. Here, we have already determined in connection with the nondiscrimination aspect of Washington's challenge to the RIF that the fiscal and office efficiency rationales relied on by the Navy are pretextual. In keeping with the holding in *St. Mary's Honor Center,* Washington is entitled to present her case to a factfinder for a determination of the ultimate issue of discrimination. —— U.S. at ——, ——, 113 S.Ct. at 2749, 2756 (upon showing of pretext, issue of discriminatory motivation "remains a question for the factfinder to answer"). Summary judgment on Washington's race discrimination claim in connection with the RIF was therefore inappropriate.

We have already awarded Washington the equitable relief of reinstatement with back pay and benefits because of the unlawfulness of the personnel action at issue. With respect to her discrimination claim, we note that the Civil Rights Act of 1991 broadened the remedies available to successful Title VII litigants. *See* Civil Rights Act of 1991, Pub.L. No. 102–166, §§ 102, 105 Stat. 1071, 1072–74, 1075–76 (1991) (codified at 42 U.S.C. §§ 1981a, 2000e–5(g)).[17] If on remand

---

**16.** The dissent agrees that Washington has raised a genuine issue of material fact on the question of whether the RIF action was prompted by racial animus. Because Washington relies on the circumstantial indicia of discrimination to make her *prima facie* case, we do not have occasion to consider whether the evidence of racial hostility alone would suffice as a *prima facie* showing. However, the dissent suggests that the evidence of racial tension does not support Washington's discrimination claim. We refer to the evidence that Norrod, a white female, complained to the EEO officer that Washington was mistreating her on account of Norrod's race. If Norrod's allegation were shown to be true, we agree that it would not support Washington's case. But if it is untrue, as Washington claims,

Norrod's complaint was racially discriminatory because it singled out Washington unfairly on account of Washington's race. We cannot decide this disputed factual issue on appeal; nor could the district court on summary judgment. At this stage, we must accept Washington's version of the events as true, and Washington's version lends support to her claim of racial animus.

**17.** The Ninth Circuit has held that the 1991 amendments are to be applied retroactively to cases pending at the time of its enactment. *Estate of Reynolds v. Martin*, 985 F.2d 470, 476 (9th Cir.1993).

Washington establishes that the abolishment of her position was motivated by racial animus, she may be entitled to additional equitable relief and compensatory damages. *See* 42 U.S.C. § 1981a (providing for compensatory damages in certain Title VII cases); 42 U.S.C. § 2000e–5(g)(1) (providing for various forms of equitable relief for successful Title VII plaintiffs).[18]

#### b. *Sex discrimination*

■■ The record reflects that at the time Washington's position was abolished, there were no males in the Public Affairs Office other than Buechner, and thus no males who were potentially subject to the RIF. Because, under these circumstances, Washington cannot show that men were treated more favorably than she was, she has failed to make out a *prima facie* case of sex discrimination.

Nor has Washington presented any direct evidence of gender-based discrimination in connection with the RIF. The district court was correct in granting summary judgment with respect to this aspect of the case.

#### ·c. *Reprisal*

■■ The district court upheld the Board's finding that the RIF did not constitute an illegal reprisal for Washington's protected EEO activities.

A claim of retaliation for engaging in protected EEO activities arises both under Title VII as a form of employment discrimination and pursuant to the prohibited personnel practice provisions of the CSRA. *See* 5 U.S.C. § 2302(b)(9); 42 U.S.C. § 2000e–3(a); *see also* 29 C.F.R. § 1613.261 (EEOC) ("It is unlawful to restrain, interfere, coerce or discriminate against complainants … during any stage in the presentation and processing of a complaint … or because an individual filed a charge of discrimination. . . ."); *Cruz v. Department of Navy,* 934 F.2d 1240, 1256

(Fed.Cir.1991) (Skelton, J., dissenting) (noting dual nature of reprisal claims).

Whether we consider her claim of reprisal under the de novo or more deferential standard of review, it appears that Washington has failed to establish that she was retaliated against for her protected activity. As the district court observed, the record shows that Washington's first informal EEO complaint was filed in April, but the RIF was underway by early February. The timing of the two events negates an inference of retaliation, and summary judgment was proper.

### B. The GS–11/12 Position

#### 1. *Nonselection*

■■ Washington asserts that her reemployment rights were violated when she was not hired for the GS–11/12 public affairs specialist job at the North Island facility.[19] The district court ruled that the Navy was not required to consider her for the position because it chose to fill it at the GS–12 level.

An agency implementing a RIF must establish and maintain, within its commuting area, an RPL on which the names of employees eligible for priority consideration are entered. 29 C.F.R. § 351.1001–.1002. The RPL confers upon the employee certain reemployment priority rights: "When a qualified person is available on the agency's reemployment priority list, the agency may not fill a competitive position by the transfer of an employee of a different agency or by the new appointment of any person except a 10–point preference eligible." *Federal Personnel Manual System* ch. 330, subch. 2, § 2–6 (1989) (discussing RPL rules in effect prior to December 8, 1988). At the time of the RIF at issue in this case, an employee's name was to be placed automatically on the RPL by the agency the day after she received notification of her impending separation. *Id.* § 2–3(c). The then-existing rules further provided that a separated employee could be considered for "*all* competitive ser-

---

18. Of course, Washington may recover on her discrimination claim only to the extent that she has not already been compensated by the relief we have ordered on the other aspect of her RIF claim.

19. We note that while Washington contends she was entitled to consideration for the GS–11/12 position as an RPL candidate, she does not claim she should have been considered for the higher-graded position under the PPP.

vice positions [in the commuting area] for which [she was] qualified and available." *Id.* at A–9, § 2–3 (emphasis added).[20]

Since she received her RIF notice on May 6, 1988 and was viewed as qualified for positions at the GS–9 and GS–11 levels, Washington should have been considered as a priority candidate for the GS–11/12 public affairs position at North Island that was advertised in June and July of that year. Her name may not have been entered on the RPL until as late as August, however, and it is undisputed that the North Island personnel in charge of hiring for the position had never heard of her.

The government asserts that, despite these omissions, it was nonetheless acceptable to hire an outsider at the GS–12 level instead of Washington. In support of this contention, the Navy relies on a declaration by the chief of the Staffing Policy Division of the Office of Personnel Management ("OPM"), which explains that OPM interpreted the 1988 RPL rules as follows:

> It is within an agency's discretionary authority to choose to fill a position at the full performance level or lower. In this case, Navy advertised the vacancy at two levels—GS–12 and 11. By doing so, Navy retained its discretion to decide at which level it eventually would *fill* the position.... Navy's obligation was to clear the RPL only at the grade the vacancy was *filled,* and not at all grade levels at which it was advertised and *could have been filled.*

(S.E.R. at 127.) Under this interpretation, even if Washington should have appeared on the RPL list, she cannot challenge the agency's decision because she was not qualified for the job that was ultimately bestowed on the GS–12 candidate.

■ OPM's interpretation of the RPL rules is entitled to considerable weight since it is OPM that administers them. *Force v. Director, Office of Workers' Compensation Programs,* 938 F.2d 981, 983 (9th Cir.1991).

Although Washington theoretically could have rebutted the OPM declaration with evidence that the guidelines were applied differently in practice, she did not present any such proof.

In light of the Navy's showing as to the administration of the RPL rules, Washington cannot establish any prejudice resulting from the failure to consider her for a position that was filled at the GS–12 level. Thus, summary judgment was appropriately granted on this aspect of Washington's GS–11/12 claim. *See Baxter v. Department of the Army,* 45 M.S.P.R. 663, 668 (1990) (with respect to agency's failure to include employee on its RPL, "only harmful agency error provides a basis for reversal of the agency's action. The burden is on the appellant to show by preponderant evidence that any error caused substantial prejudice to his substantive rights." (citations omitted)), *aff'd in part and vacated in part on other grounds,* 935 F.2d 279 (Fed.Cir.1991).

### 2. *Discriminatory animus*

■ Washington contends that the alleged failure to honor her reemployment rights with respect to the GS–11/12 claim was the result of race and sex discrimination.

A plaintiff must prove discriminatory intent when she alleges disparate treatment. *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 672 (9th Cir.1988). Because it is uncontroverted that the North Island hiring personnel had never heard of Washington when they made their hiring decision, Washington lacks an element essential to her claim. Summary judgment was therefore properly granted.

### C. The GS–7/9 Position

■ Washington asserts that she was entitled to priority consideration as both an RPL and PPP candidate for a second opening at Island Trees at the GS–7/9 level, and that the Navy's failure to offer her the job violated her reemployment rights and was

---

**20.** In its published decision in this case, the MSPB noted that this regulation was modified subsequent to the events giving rise to Washington's reemployment claims. *Washington v. Department of Navy,* 44 M.S.P.R. 419, 421 n. 2

(1990). Under the newer version, RPL–listed employees are only given priority over outside candidates for positions at the same or a lesser grade. *Id.*

discriminatory. The government argues, and the district court found, that the GS–7/9 claim is time-barred.[21]

Under the statutory scheme, a complainant with a mixed case who receives an unfavorable disposition of her discrimination claim from the MSPB may either petition the EEOC for further review of that claim or take the case directly to the appropriate district court. 5 U.S.C. § 7702(a)–(b). If she petitions the EEOC, she must wait until the Commission has issued a decision before she seeks judicial review unless 180 days have gone by, at which time she is entitled to appeal to the district court even though the EEOC has not acted. 5 U.S.C. §§ 7702, 7703(b)(2). Should she opt for the alternate route and appeal directly to the district court from the MSPB, she has thirty days from the issuance of the Board's final decision in which to file suit. 5 U.S.C. § 7703(b)(2).

The Board issued its final order in the GS–7/9 case on March 30, 1990. Washington has produced evidence that she timely petitioned the EEOC for review of the GS–7/9 claim. Rather than wait for a decision from the EEOC as she had in the other actions, however, she instead filed in the district court on June 5, 1990. Since she did not meet the thirty-day deadline and 180 days had not elapsed from the time she sought EEOC review, her complaint was untimely.

Washington asserts that she should be excused for filing late because she assumed when she did not hear anything from the EEOC within thirty days' time that the EEOC was not going to act and that she had therefore exhausted her administrative remedies.

In *Irwin v. Veterans Admin.,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court held that federal statutory time limitations on suits against the government are not jurisdictional in nature. Rather, "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id.,* at 95–96, 111 S.Ct. at 457–58; *see also Williams–Scaife v. Department of Defense Dependent Schools,* 925 F.2d 346 (9th Cir.1991) (following *Irwin* in Title VII case). In so holding, however, the Court observed that invocation of the equitable tolling doctrine is not appropriate in cases in which the litigant has failed to meet a deadline as a result of "garden variety" neglect. 498 U.S. at 96, 111 S.Ct. at 458.

Although Washington's pro se status must be taken into consideration, the fact that she proceeded correctly in the other two actions indicates that she was familiar with the procedural requirements. In each of those cases, the EEOC took longer than thirty days to render a decision. The district court was therefore justified in dismissing as time-barred the claims surrounding Washington's nonselection for the GS–7/9 position.

### D. Motion to Compel

Washington appeals the district court's affirmance of the magistrate judge's November 1991 discovery order. She had sought to compel the Navy to produce various documents, some of which apparently did not exist. The magistrate granted certain of Washington's requests and denied others.

In upholding the magistrate's ruling, the district judge noted that the defendant was not required to create documents to satisfy Washington's discovery requests. Some of the requests she determined to be overly broad. Finally, she was concerned that the

---

21. Relying on *Wall v. United States,* 871 F.2d 1540 (10th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990), the government also contends that the district court was without jurisdiction to hear the GS–7/9 claim because the MSPB dismissed the action for failure to raise an appealable issue. It is unclear from the Board's order why it decided that Washington could not properly appeal her nonselection for the GS–7/9 position.

*Wall* held that the Federal Circuit has exclusive jurisdiction where, as in this case, the Board finds that there is no appealable personnel action and therefore declines to consider an employee's claim of discrimination. *Id.,* at 1542–44. On its face, this holding seems to conflict with the language of 5 U.S.C. § 7703(b)(2), which provides that petitions for judicial review of mixed cases "shall be filed" under Title VII or another applicable discrimination statute. We decline to resolve this issue, however, in view of our determination that Washington missed the filing deadline for this claim.

Navy's production of certain of the documents sought by Washington might violate the confidentiality standards embodied in 5 U.S.C. § 552. *See* 5 U.S.C. § 552(b) (exempting certain government records from public disclosure). The district court's ruling was reasonable and within its discretion.

## CONCLUSION

We **REVERSE** the district court's grant of summary judgment with respect to certain aspects of the RIF claim and **REMAND** those aspects that we have restored to the district court. Since we have found that the RIF was not a lawful personnel action, the district court is directed to remand instanter that portion of the case to the MSPB with instructions to order the reinstatement of Washington to her GS–9 editorial position and to award back pay and benefits. Consistent with this opinion, the district court shall proceed with the race discrimination portion of the RIF claim. We **AFFIRM** the district court's grant of summary judgment with respect to the other aspects of the RIF claim and with respect to the GS–11/12 claim, its dismissal of the GS–7/9 claim, and its partial denial of Washington's motion to compel.

DAVID R. THOMPSON, Circuit Judge, dissenting:

I respectfully dissent from the portion of the majority opinion that reverses the Merit System Protection Board's affirmance of the ALJ's finding that the Navy's "RIF action was based on a legitimate management reason." ALJ Decision, *Washington v. Navy*, Docket No. SFO3518910016 filed Feb. 2, 1989, pp. 4–5 (ER 43–44). On this issue, we must apply a deferential standard of review.

It is our obligation as a reviewing court to affirm the Board's decision if it is supported by substantial evidence. *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir.1990). Substantial evidence means more than a mere scintilla but less than a preponderance of the evidence. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir.1991); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion") (citation omitted).

Substantial evidence need not convince us; it merely "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citation omitted). "Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982).

By choosing not to .recognize this well-accepted role of deference in reviewing for substantial evidence, the majority improperly grants itself the privilege of weighing the evidence de novo and substituting its fact-finding from the cold record for that of the ALJ who heard the case firsthand.

The majority bases its reversal of the Board's decision on the notion that "all the credible evidence in the record indicates that the RIF was effected for reasons personal to Washington." In so stating, the majority disregards the ability of the ALJ to pass on the credibility of evidence. This frustrates important policies underlying the substantial evidence standard of review. The standard "frees the reviewing courts of the time-consuming task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute." *Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026.

Approaching the case as the primary fact-finder, the majority finds that the testimony of Capt. P.M. Reber, Chief of Staff of the Naval Training Center at San Diego, California, was "equivocal." It makes this finding despite the ALJ's express finding that Reber's testimony was credible.

The majority finds Reber's testimony "equivocal," because although he testified he "wasn't aware of any problems with Ms. Washington's conduct when [h]e made the decision to abolish her position," he also testified "that at the time he approved the RIF, he understood that Washington's performance was 'in question' and 'needed read-

just[ing].' " Returned to its proper context, however, this "equivocal" testimony is not equivocal at all. It is consistent with Reber's overall testimony that the RIF was not in response to performance problems:

Q: Did Lieutenant Buechner discuss Ms. Washington's performance or conduct with you?

A: * * * He ha[d] spoken with her the day before about her evaluation of her performance which was the routine time to do so, and in the course of doing so her performance evaluation was satisfactory and I don't believe there was anything that he had found a particular fault in her evaluation, and during the time—during the counseling he told me he did have some criticism of some of the things that he wanted to add to the evaluation as part of his counseling. And he told her that there were some things that he wanted to improve or something, that her performance needed readjust[ing] or whatever.

 \* \* \* \* \*

Q: Was her performance ever in question?

A: Not more than any—yes, I suppose in the sense that he had some criticism of it.

S.E.R. at 72–73.

In context, it becomes clear that Reber's "equivocal" testimony reflects that at the time he ordered the RIF, he knew Washington as an employee whose performance evaluation was satisfactory and did not reveal particular faults in her performance.

The majority also relies for its finding that Reber's testimony was "equivocal" on his further testimony that he "conceded that had Washington not walked off the job on February 2, it was 'possible' that she would have retained her editing job on *The Hoist.*" Again, the majority chooses to quote only a portion from Reber's testimony. In context, his testimony was:

Q: [I]f the conduct of Ms. Washington had been satisfactory and if she had not walked off the job on 2 February would she now be employed as editor of *The Hoist*?

A: In the first place I have no reason to believe that her conduct was anything other than satisfactory, and at the time by the 2nd of February, and the fact that—I guess it includes that we didn't discover that the job was done better without her stands to reason that had she stayed there it's possible. I don't know we might have discovered it later in some other way but that's the way it happened. I have no idea what might have happened.

*Id.* at 90–91.

Reber's testimony, therefore, fails to support the implication advanced by the majority: that Washington may have lost her job as punishment for leaving it on February 2. This is not what Reber said. He testified that Washington's absence was a cause of the RIF only because it allowed Reber to learn that her position was not indispensable.

The majority, however, finds Reber's testimony "inherently unbelievable." It takes exception to the Navy's explanation that the RIF was part of a plan to increase long term efficiency. The Navy, however, presented a plausible explanation: having found that *The Hoist* did not require the services of a full-time editor, it made sense to put Washington to work as a reporter.

The majority also points to the hiring of a secretary as proof that the Navy was not concerned with efficiency in changing Washington's duties. This circumstance, however, lends no support to the majority's factfinding; the addition of the secretary was not linked to the RIF that affected Washington. Moreover, it substitutes the majority's ideas as to how the Naval Training Center's *Hoist* office should be run for the ideas of the people who were charged with running it.

In sum, rather than searching the record to determine whether there is "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion," *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427 (emphasis added), the majority searches the record to try to find some inconsistencies which will permit it to make findings contrary to those made by the ALJ and affirmed by the Board. This simply will not do.

Even if the evidence were "susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld." *Sample,* 694 F.2d at 642.

Because the record contains substantial evidence to support the Board's determination affirming the ALJ's findings, I would affirm the finding that the Navy based the RIF action on legitimate management reasons.

Washington's discrimination claim, however, comes to us clothed in a different standard of review. Here, our review is de novo. I agree with the majority that Washington raised a genuine issue of material fact on the question whether the RIF action which eliminated her job was prompted by race discrimination. The ALJ and the Board decided it was not, but on this issue the question before the district court, and before us, is whether Washington raised a genuine issue of material fact. She did, and I agree this question should be remanded to the district court for further proceedings.

I do not agree, however, that Washington's discrimination claim is advanced by the evidence of "racial tension" to which the majority refers. This is the evidence that Norrod, a white female, accused Washington in an EEO complaint of racial discrimination when Washington allegedly said to Norrod: "when you're little and cute and white, you get your way." Washington cannot use her own alleged racial slur toward Norrod to buttress her claim that she was the victim of discrimination.

Nor do I agree with the majority's assertion that economic constraints and office efficiency "in the ordinary case [are] such fundamentally different justifications for an employer's action [that relied upon together they] would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." In my view, we cannot characterize as "fundamentally different justifications for an employer's action," economic constraints and office efficiency. I do not agree that an employer's reliance upon these factors would provide any evidence of pretext nor suggest the pos-

sibility that neither reason was the true reason, in this case or in "the ordinary case."