**Al M. HOTCHKINS, Plaintiff,**

**v.**

**FLEET DELIVERY SERVICE, aka Fleet Delivery Service, NW, a Nevada Corporation, Defendant.**

No. Civ. 97–867–KI.

United States District Court, D. Oregon.

Aug. 14, 1998.

Evelyn Conroy, Jolles, Sokol & Bernstein, Portland, Oregon, for plaintiff.

David J. Riewald, Daniel R. Barnhart, Bullard, Korshoj, Smith & Jernstedt, Portland, Oregon, for defendant.

David J. Riewald, Daniel R. Barnhart, Bullard, Korshoj, Smith & Jernstedt, Portland, Oregon, for defendant.

## OPINION

KING, District Judge.

Before the court is a motion for summary judgment (# 24) by defendant Fleet Delivery Service ("Fleet") against all claims brought by plaintiff Al M. Hotchkins ("Hotchkins"). Hotchkins alleges racial discrimination in violation of 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 1981. Specifically, Hotchkins alleges that (1) he was subject to harassment and a hostile work environment while employed at Fleet; and (2) his termination from Fleet was discriminatory and constitutes disparate treatment based on race. As explained below, Hotchkins fails to offer sufficient evidence to support either theory of liability. Accordingly, I grant Fleet's motion for summary judgment.

## FACTS

Fleet is a courier business that delivers time-sensitive documents for banks and financial institutions. In the lobby of its Oregon facility, Fleet posts a statement from its president that the company has a zero-tolerance discrimination policy.

Hotchkins is an African–American citizen. He began working as a Fleet driver on December 19, 1994 and became a relief driver on May 15, 1995. Relief drivers are required to fill in for regular drivers who are absent. They are paid more than regular drivers and are critical to Fleet's business because the materials delivered by Fleet are time-sensitive. Late deliveries expose Fleet to financial penalties and create the risk that clients will take their business elsewhere.

In October 1995, Fleet hired Gino Castro as a dispatcher. In November 1995, Fleet promoted Castro to operations manager. As operations manager, Castro was responsible for dispatching as well as managing and evaluating drivers. In December 1995, Fleet hired Jim Wood as the general manager for its Oregon operations.

On or about March 20, 1996, Castro asked two relief drivers, Jeff Crosby and Hotchkins, to sweep the garage during a down period. Hotchkins refused and filed with management a written statement, dated March 20, 1996, regarding his refusal:

I was hired as a delivery driver, then promoted to a relief driver. I was not hired as a janitor & I was insulted too (sic) be asked too (sic) sweep the floor. Not that we are better thin (sic) sweep floor. But that we would be better use (sic) for showing new driver were (sic) the pumps are[,] how to use them etc. I feel I have showing (sic) time after time my ability to handle problems in the field as well as with dispatch. Therefore, *instead* of *sweeping floors, picking* up *trash* etc.[,] I feel if there is no route too (sic) do, I should be in

the office helping dispatch[.] Something will always come up for all *relief driver* (sic) to do. (Emphasis in original).

Castro testified at his deposition that Crosby, who is white, swept the garage that day. In his affidavit in opposition to summary judgment, Hotchkins states that neither he nor Crosby swept the floor that day.

Hotchkins also states that, in the latter part of April 1996, Wood asked him to sweep the floor "when another relief driver had been sitting around doing nothing." Hotchkins Aff. ¶ 10. In regard to this later incident, however, Hotchkins testified at his deposition that, in fact, he did not know whether the other driver had been sitting there for an hour. Hotchkins Dep. at 171. Furthermore, Hotchkins testified that both he *and* Crosby were also asked to sweep that day and that Crosby could have already swept before Hotchkins arrived at work. Hotchkins Dep. at 171–72.

On April 19, 1996, Hotchkins got into a confrontation with a Fleet driver named Mel Forsyth. Forsyth was trying to leave Fleet's office, but was blocked by Hotchkins, who was holding the door and talking to someone. Hotchkins called Forsyth a "little bitch" and Forsyth responded by calling Hotchkins a "nigger." Castro, who overheard the exchange, separated Hotchkins and Forsyth. Castro and Wood both informed Forsyth at the scene that such remarks would not be tolerated.[1] That same day, Wood wrote and signed a statement entitled "Driver Conference" and placed it in Forsyth's personnel file. The statement reads as follows:

On 4–19–96, Al Hotchkins refused to let you out of the office door by leaning on it and ignoring your request to "excuse me." You called him a "nigger," and this type of language will not be tolerated at Fleet Delivery Service. This is a warning that any further action or accusations by you will result in disciplinary action up to and including termination.

---

**1.** Hotchkins also alleges that Wood had additional interactions with Forsyth at the scene of the incident. There is some disparity, however, between the version told by Hotchkins in his deposition and the version in his affidavit filed in opposition to summary judgment. In his deposition, Hotchkins testified that "Mr. Wood came out, grabbed Mr. Forsyth around the neck, walked him to his car, sent him on his way...." Hotchkins Dep. at 136. In his affidavit, Hotchkins states "Jim Wood put his arm around the name-caller and walked off with him." Hotchkins Aff. at ¶ 9.

Wood testified that he does not recall whether he spoke to Forsyth about the written reprimand.

On April 22, 1996, Hotchkins gave a letter of protest, dated April 20, 1996, to Wood. In such letter, Hotchkins stated, in part, the following about the incident with Forsyth:

> I feel that I am due an apology. I also feel that Mel should be reprimanded for his actions and that he along with all of the Fleet team be informed that no form of prejudice, discrimination, or discriminatory remarks will be condoned or tolerated by Fleet.

Hotchkins testified that Forsyth never apologized to him about the incident.

On Wednesday, April 24, 1996, Hotchkins asked Castro if he could take the next day off to take care of some personal business. Castro gave Hotchkins the day off because Fleet had another driver who could cover the route.

On Friday, April 26, 1996, Hotchkins was scheduled to cover a coast route to Astoria that started at 3:00 p.m. That morning, Hotchkins called Castro and told him that he could not work that day. According to Castro, he replied to Hotchkins that Fleet did not have enough drivers to cover the route that Hotchkins was scheduled to drive and Hotchkins would have to drive his route. He also told Hotchkins that, in the meantime, he would try to find someone else to cover the route. Castro further testified that Hotchkins called back later that morning and Castro informed Hotchkins that, in fact, he could not find a replacement and that Hotchkins would have to cover the route. Castro testified that Hotchkins told him that he was coming to work.

Hotchkins maintains that Castro never told him that he could not take the day off. Likewise, Hotchkins states that he never told Castro that he would, in fact, report to work. Finally, in his affidavit in opposition to summary judgment, Hotchkins states that, based on his telephone conversations with Castro that day, he understood that Castro would

get someone to cover Hotchkins' route. In his deposition, however, Hotchkins testified that during each of his three conversations with Castro, Castro stated that he had not found someone to cover Hotchkins' route. In response to the final time that Castro told Hotchkins that he did not have a driver to cover Hotchkins' route, and that Castro was about to leave for the day, Hotchkins testified that he "Probably smirked at [Castro] like, 'Good luck,' like, 'I'm out of there.' I knew I wasn't gonna be doing the route anyway." Hotchkins Dep. at 111.

After Castro had spoken with Hotchkins, Wood called or paged Hotchkins at home and asked Hotchkins to bring a company cellular phone in Hotchkins' possession.[2] Hotchkins felt that, in making his request, Wood was accusing Hotchkins of having stolen the phone.

Hotchkins brought the phone that day to Wood sometime before 3:00 p.m. At that time, Hotchkins notified Wood that he was not coming in later to work that day. According to Wood, after checking with the dispatcher and confirming that Fleet had no one else to cover the route that was assigned to Hotchkins, he insisted that Hotchkins report to work to drive his assigned route but Hotchkins refused. According to Hotchkins, he felt that he had the day off and so informed Wood. Hotchkins characterizes his discussion with Wood as an "angry confrontation." Plaintiff's Concise Statement of Material Facts, ¶ I.

On Monday, April 29, 1996, Wood informed Hotchkins that he was being suspended for three days for his refusal to perform his job. Wood completed a "Driver Conference" form that memorialized such decision. Hotchkins refused to sign the form in the space provided for the employee's signature.

In a letter dated May 1, 1996, that Hotchkins apparently sent to Fleet's management in Las Vegas, Nevada, Hotchkins complained that his suspension was unreasonable because, at least in part, there was no oral or written warning. In such letter, Hotchkins also set forth an explanation of the events

---

**2.** At his deposition, Hotchkins testified that when he returned the page, he actually spoke to the dispatcher, not Jim Wood, and that the dispatcher informed him that "Jim said something about the phone" and such statement "irked" Hotchkins. Hotchkins Dep. at 119.

that transpired on April 26, 1996, including the request by Wood that he return the company phone, in regard to which he stated:

> I have been employed at Fleet for about 2 years and I was highly insulted. I felt that the situation around home wasn't good because of the job and the situation around Fleet was going down hill. So I decided to go home and handle my business.

In his affidavit in opposition to summary judgment, Hotchkins states that, at the April 29, 1996 meeting with Wood, he reacted as follows to his suspension:

> I told him it was another example of how unfairly I was being treated. I was subject to racial slurs, told to sweep up, accused of stealing, and given a hard time when I needed time off. I had worked very, very hard for that company and felt that no white driver would be treated that way. I told Mr. Wood I would file a complaint. I did write a letter to Las Vegas complaining about the suspension. Hotchkins Aff. ¶ 14.

At his deposition, Hotchkins also testified that he discussed with Wood, at the April 29, 1996 meeting, issues related to his race and his treatment at Fleet. In his May 1, 1996 letter to Fleet management, however, Hotchkins made no reference to racial slurs or sweeping and did not attribute his treatment by Fleet and its employees to his race.

On May 2, 1996, Wood testified that he met with Hotchkins and asked him what he expected Wood to do about Hotchkins' refusal to work. Accordingly to Wood, Hotchkins stated "Do what you got to do. If you have to fire me, fire me." Wood Dep. at 39. Hotchkins denies that such a conversation took place. Wood terminated Hotchkins that day for failure to perform his job.

Hotchkins states in his affidavit in opposition to summary judgment that white drivers at Fleet have failed to show up for their scheduled routes but were not fired. Hotchkins Aff., ¶ 16. Likewise, he states that white drivers have had confrontations with management and stormed off but were not fired. *Id.*, ¶ 17.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. Accordingly, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31.

## DISCUSSION

### I. *Discriminatory Termination Claim*

Hotchkins alleges that he suffered intentional discrimination during the course of his employment based on his race/color and that such discrimination eventually resulted in his termination. Complaint, ¶¶ 5, 10. Title VII provides that "it shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's ... race...." 42 U.S.C. § 2000e–2(a)(1). Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and

enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981.[3]

■ To prevail on a claim of disparate treatment based on race, a plaintiff must prove that his employer's challenged decision was motivated by intentional discrimination. *Washington v. Garrett*, 10 F.3d 1421, 1431–32 (9th Cir.1993). Because in most employment discrimination cases direct evidence of discriminatory motive is unavailable or difficult to obtain, the Supreme Court has set forth an indirect method of proof which relies on presumptions and shifting burdens of production. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, a plaintiff opposing summary judgment on his disparate treatment claim carries the initial burden of establishing a *prima facie* case of employment discrimination. *Garrett*, 10 F.3d at 1432. By establishing a *prima facie* case, the plaintiff raises a presumption that the employer engaged in intentional discrimination. *Burdine*, 101 S.Ct. at 1094. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* If the employer carries its burden, the presumption of discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The plaintiff must then raise a genuine factual issue as to whether the articulated reason was pretextual. *Garrett*, 10 F.3d at 1432. To avoid summary judgment, the plaintiff must produce "specific, substantial evidence of pretext" in response to defendant's evidence of nondiscriminatory reasons. *Wallis v. J.R. Simplot Company*, 26 F.3d 885, 890 (1994) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983)). The plaintiff

> must produce enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for [the plaintiff's] discharge was false, *or* (b) that the

true reason for his discharge was a discriminatory one.

*Nidds v. Schindler Elevator Corporation*, 113 F.3d 912, 918 (9th Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997) (emphasis in original). "When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption." *Wallis*, 26 F.3d at 890–91.

### A. Prima Facie Case

■ The requisite degree of proof necessary to establish a *prima facie* case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889. "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.'" *Id.* (citation omitted). A plaintiff needs to produce only "very little" evidence to establish his prima facie case. *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991). Even with this minimal burden, Hotchkins fails to establish a *prima facie* case based on circumstantial or direct evidence.

■ Under the *McDonnell Douglas* approach, a *prima facie* case of employment discrimination can be established through circumstantial evidence that is developed using certain factors. Generally stated, the factors are: (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class. *McDonnell Douglas*, 93 S.Ct. at 1824; *Wallis*, 26 F.3d at 889. Recognizing that such factors are malleable depending on the particular employment context, the Ninth Circuit, in *Garrett, supra*, modified these factors to fit the context of an employee who had been terminated in a "re-

---

**3.** Disparate treatment claims under Section 1981 are analyzed under the same standard and approach used to analyze disparate treatment claims under Title VII. *Patterson v. McLean Cred-* *it Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1484 (9th Cir.1986).

duction in force" action by the U.S. Navy. The *Garrett* court held that a plaintiff "may establish [a] *prima facie* case [of race discrimination] by demonstrating: (1) that she belongs to a protected class; (2) she was discharged from a job for which she was qualified; and (3) that others not in her protected class were treated more favorably." *Garrett*, 10 F.3d at 1434. I will apply these factors to determine if Hotchkins has established a *prima facie* case, using circumstantial evidence, of employment discrimination by Fleet.

In the case at hand, it is undisputed that Hotchkins belongs to a protected class and was discharged from his job. Hotchkins has presented evidence, in the form of July and December 1995 performance evaluations, that he was qualified for the position and capable of performing his duties. Regardless, Fleet would have a difficult time challenging Hotchkins' qualifications given that its primary complaint was that he did not drive his route. Accordingly, I assume that Hotchkins was qualified for the job and thus the first two factors set forth in *Garrett* are satisfied.[4]

█ In regard to the third factor, however, Hotchkins has produced almost no evidence that Fleet treated other employees differently than him. In fact, Hotchkins offers only conclusory statements in his affidavit that white drivers at Fleet have failed to show up for their scheduled routes but were not fired and that white drivers have had confrontations with management and stormed off but were not fired. Hotchkins

does not provide a single example or incident in support of these assertions. Hotchkins' affidavit, without more, is not enough to create a *prima facie* case through circumstantial evidence.

At oral argument, Hotchkins' attorney stressed that Forsyth had not been terminated for his racial slur directed at Hotchkins, while Hotchkins had been terminated for failing to report to work. She argued that such a difference in disciplinary action demonstrates that drivers not in Hotchkins' protected class were treated differently for comparable misconduct. Although Forsyth's conduct was certainly inappropriate, it is not sufficiently comparable to Hotchkins' failure to report to work for the disparity in disciplinary consequences to create an inference of racial discrimination.

Hotchkins also fails to establish a *prima facie* case through the use of direct evidence. Although it is undisputed that in the incident between Hotchkins and Forsyth, Forsyth called Hotchkins a "nigger," one isolated or "stray" act of this nature is insufficient to show discrimination, especially when the remark was not made by a supervisor or other management employee. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) ((citing *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314–16 (6th Cir.1989) (finding that a "single, isolated discriminatory comment" by plaintiff's immediate supervisor was insufficient to trigger burden shift or to avoid summary judgment for defendant.)))[5] Furthermore, the actions by Cas-

---

**4.** In making this finding regarding Hotchkins' qualifications as a relief driver, I reach no conclusions here regarding Hotchkins *performance* of his job duties, including his alleged refusal to work on April 26, 1996. I acknowledge that a showing of an employee's satisfactory performance of his job duties is, arguably, required under the *McDonnell Douglas* circumstantial evidence test to create a *prima facie* case. Given that Hotchkins fails to make a *prima facie* case for other reasons, and Hotchkins contests his alleged poor job performance on April 26, 1996, I will consider Fleet's evidence of poor performance in the context of pretext.

**5.** I note that in Hotchkins' complaint to the Bureau of Labor and Industries, dated July 31, 1996, he mentioned other confrontations that he had with coworkers:

In August 1995, a coworker, Ed, attempted to antagonize me into a physical confrontation. I did not respond, but Ed called the police on me. A similar incident occurred on another occasion. Although I complained about this to Respondent's Manager Jim Wood, no action was taken against either coworker.

In response to Fleet's motion for summary judgment, Hotchkins apparently decided not to raise these incidents as evidence of discrimination at Fleet. For instance, facts regarding an incident with coworker Ed Ritt and an incident with coworker Randy Thorn are referred to by the parties, but are not included in Hotchkins' concise statement of material facts. Instead, Hotchkins' response brief downplays the incidents and chastises Fleet for discussing them. Furthermore, Hotchkins acknowledges in his affidavit

tro and Wood immediately after the incident, including the written reprimand issued to Forsyth, indicate that Fleet management did not condone Forsyth's conduct.

In regard to the evidence that Hotchkins was asked to sweep the garage on two particular occasions, the undisputed facts are that Crosby, a white driver, was also asked at those times to sweep the garage. Furthermore, the statement written by Hotchkins regarding the March 20, 1996 incident reveals that his complaint was that relief drivers were required to sweep the floor and perform other custodial duties, not that he as an African–American relief driver had been singled out for such tasks.

Finally, in regard to Wood's request that Hotchkins return a company phone and Hotchkins' impression that Wood was accusing him of stealing the phone, such a reaction by Hotchkins does not show discriminatory intent by Wood or Fleet. In fact, the record is devoid of any evidence that Wood, Castro, or any management or supervisory employee exhibited racist behavior toward any employees at Fleet. Hotchkins fails to create a *prima facie* case of employment discrimination through direct or circumstantial evidence.

### B. *Evidence of Pretext*

▮ Even if the evidence provided by Hotchkins were enough to create a *prima facie* case of intentional discrimination, such evidence is not sufficient to demonstrate that Fleet's reason for discharging Hotchkins was a pretext. Hotchkins has the burden of demonstrating pretext because Fleet has pre-

sented evidence of a legitimate, nondiscriminatory reason for terminating Hotchkins, i.e., Hotchkins' refusal to report to work on April 26, 1996. Likewise, the record contains substantial evidence that Hotchkins did, in fact, choose not to report to work on April 26, 1996 despite the fact that he had not been given permission to take the day off and that no other driver was available to fill in. Fleet's evidence of its legitimate, nondiscriminatory reason for terminating Hotchkins is sufficient to rebut any *prima facie* case theoretically established by Hotchkins.

In response to the legitimate, nondiscriminatory reason for termination articulated by Fleet, Hotchkins fails to produce "specific, substantial evidence of pretext." *Wallis,* 26 F.3d at 890. Hotchkins insists that he had April 26, 1996 off but provides no evidence that would allow a reasonable factfinder to conclude that Fleet's alleged reason for Hotchkins' discharge was false. *See Nidds,* 113 F.3d at 918 (the plaintiff "must produce enough evidence to allow a reasonable factfinder to conclude *either:* (a) that the alleged reason for [the plaintiff's] discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one." (Emphasis in original)). Likewise, Hotchkins provides no evidence that would allow a reasonable fact finder to conclude that the true reason for his discharge was a discriminatory one.[6] *Id.* Although he provides the direct and circumstantial evidence discussed above, such evidence fails to satisfy Hotchkins' burden in demonstrating pretext, just as it was insufficient to create an inference of discrimination for purposes of a *prima facie* case. Hotchkins has failed to show that race was a

that Ed Ritt was, in fact, terminated in response to his incident with Hotchkins.

Regardless of whether Hotchkins intended to present these incidents as evidence of a discrimination by Fleet, neither incident involved management personnel or issues of Hotchkins' race and both incidents occurred long before Hotchkins' termination.

**6.** In this context, Hotchkins again argues that comparable misconduct by a white Fleet driver was not greeted by discharge and, therefore, there is evidence that Hotchkins' discharge was, in fact, discriminatory. Specifically, Hotchkins offers the example of Forsyth's use of a racial slur for which he was not discharged. As noted above, I find that Forsyth's conduct was not

sufficiently comparable to Hotchkins' failure to report to work to create the inference of discrimination that is required to establish a *prima facie* case. Moreover, I find that Forsyth's and Hotchkins' conduct was not of comparable seriousness to allow a reasonable jury to conclude that the real reason why Fleet terminated Hotchkins was a discriminatory one. As is evident from paragraphs 16 and 17 of Hotchkins' affidavit, Hotchkins recognized that what would be probative is that white drivers failed to show up for their scheduled routes and had confrontations with management and stormed off but were not fired. Hotchkins, however, did not present evidence to support such conclusions.

substantial factor, or any factor, in the decision to fire him. Consequently, Hotchkins fails to meet his burden of persuasion and Fleet's motion for summary judgment as to Hotchkins' discriminatory discharge claim is granted.

## II. *Harassment/Hostile Environment Claim*

■ With respect to Hotchkins' hostile work environment claim, he must demonstrate the existence of a "severe or pervasive and unwelcome verbal or physical harassment because of [his] membership in a protected class." *Sischo–Nownejad,* 934 F.2d at 1109 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). As explained above, the only evidence presented by Hotchkins that he was treated a particular way because of his race was the evidence related to his confrontation with Forsyth in which Forsyth called Hotchkins a "nigger." As also discussed above, the " 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' is not, by itself, actionable under Title VII." *Ellison v. Brady,* 924 F.2d 872, 876 (9th Cir.1991) (quoting *Meritor,* 106 S.Ct. at 2405). Accordingly, Hotchkins' claim for harassment also fails and summary judgment is granted in favor of Fleet on that claim.

## III. *Retaliatory Discharge Claim*

In his response brief, Hotchkins asserted that, in addition to his disparate treatment claim, he also has a retaliatory discharge claim against Fleet. Plaintiff's Response Brief, p. 13. In Fleet's reply brief and at oral argument, counsel for Fleet argued that this court does not have subject matter jurisdiction over such a claim because it was not raised in Hotchkins' EEOC complaint and, thus, Hotchkins has not exhausted his administrative remedies regarding that claim. In response, Hotchkins' attorney argued at oral argument that EEOC charges must be construed broadly and that the charges contained in Hotchkins' EEOC complaint are sufficient to be read as stating a retaliatory discharge claim.

Although there are merits to both parties' arguments regarding how EEOC charges are to be construed, the viability of Hotchkins' retaliatory discharge claim is not dependent solely on the sufficiency of his EEOC allegations. Hotchkins must also have stated a retaliatory discharge claim in the Complaint in this action, which he failed to do.

■ In his Complaint, Hotchkins clearly spells out two claims for relief: violation of 42 U.S.C. § 1981 and violation of 42 U.S.C. § 2000e–2(a). Complaint, pp. 1, 3. The Complaint contains no reference to 42 U.S.C. § 2000e–3(a)—the statutory provision, as acknowledged by Hotchkins at page 13 of his response brief, that provides for retaliation claims. Likewise, the Complaint contains no allegations that Hotchkins suffered a retaliatory discharge. Instead, the Complaint alleges that he suffered intentional discrimination during the course of his employment based on his race/color and that such discrimination eventually resulted in his termination. Complaint, ¶¶ 5, 10.

It is undisputed that Hotchkins never requested leave to amend his Complaint and that the Complaint was never amended. At oral argument, counsel for Hotchkins stated that she had raised the issue of a retaliatory discharge claim in a brief filed February 18, 1998 in response to a motion to compel filed by Fleet. Specifically, in the "Background" section at page three of such brief, Hotchkins' counsel stated that "Plaintiff has filed the present complaint for race discrimination and retaliation under 42 U.S.C. § 1981 and 2000e." Such statement was not sufficient to amend the Complaint to state a claim for retaliatory discharge.

■ Although counsel for Hotchkins did not seek leave to amend the complaint at oral argument on this motion, a court may construe the inclusion of new issues during the pendency of a summary judgment motion as a motion for leave to amend. *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994) (citing *Roberts v. Arizona Board of Regents,* 661 F.2d 796, 798 n. 1 (9th Cir.1981)), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995). However, even if I were to construe Hotchkins' retaliatory discharge arguments in his response brief as such a motion,

I would deny that motion because of the prejudice that the addition of a retaliatory discharge claim would cause to Fleet at this juncture in the case and because there is no justifiable reason for the delay in raising the retaliation claim.

Whether to grant leave to amend a complaint is in the district court's discretion, "[k]eeping in mind the strong policy in favor of allowing amendment, and considering four factors: bad faith, undue delay, prejudice to the opposing party, and the futility of amendment." *Kaplan*, 49 F.3d at 1370 (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987)). In *Roberts, supra*, the Ninth Circuit affirmed the district court's denial of the plaintiff's motion for leave to add a retaliatory discharge claim. The plaintiff made her motion for leave to amend six days after the defendant had moved for summary judgment on the plaintiff's Title VII sex discrimination claims that were premised on disparate treatment. In affirming the district court's denial of leave to amend and its finding that the addition of a retaliatory discharge claim would prejudice the defendant, the Ninth Circuit noted that "[t]he retaliatory discharge issue was raised at the eleventh hour, after discovery was virtually complete and the [defendant's] motion for summary judgment was pending before the court." *Roberts*, 661 F.2d at 798; *see also Schlacter–Jones v. General Telephone of California*, 936 F.2d 435, 443 (9th Cir.1991) ("The timing of the motion [for leave to amend the complaint], after the parties had conducted discovery and a pending summary judgment motion had been fully briefed, weighs heavily against allowing leave. A motion for leave to amend is not a vehicle to circumvent summary judgment."). As in *Roberts* and *Schlacter–Jones*, Hotchkins asserted the retaliatory discharge claim after the time for discovery had run and Fleet had moved for summary judgment. To have to defend against an additional Title VII claim

at this juncture would cause significant prejudice to Fleet.

Denial of leave to add the retaliatory discharge claim is further warranted because the relevant facts and possible cause of action arising therefrom were known to Hotchkins and his attorney before this action was commenced. *See Kaplan*, 49 F.3d at 1370 ("[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.") (quoting *Acri v. International Ass'n of Machinists*, 781 F.2d 1393, 1398 (9th Cir.), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986)). In his response brief, Hotchkins summarized the basis for his retaliatory discharge claim as follows:

> In the present case, plaintiff's evidence is that on April 22, 1996, he delivered a written protest of discriminatory treatment and on April 29, 1996 he renewed those complaints in his meeting with Jim Wood. The jury could reasonably infer that the decision to discharge plaintiff was based on his protests.

Plaintiff's Response Brief, p. 14.[7] Because Hotchkins and his attorney knew of the basis for his retaliatory discharge claim before this action was filed in June 1997, there is no excuse for the lengthy delay in asserting such a claim and denial of leave to amend is warranted. *See Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 677 (9th Cir. 1993) ("We have held that a district court does not abuse its discretion in denying leave to amend where the movant has presented no new facts but only new theories and has provided no satisfactory explanation for his failure to develop the new contentions originally. Further, we have noted that the district court's discretion is particularly broad where the plaintiff has bypassed other opportunities to amend.").

---

**7.** Although it is not necessary to find that each of the four factors listed above weighs against granting leave to amend and a finding of prejudice from delay is sufficient to deny such leave, I note that it is also likely in this case that an amendment adding a claim of retaliatory discharge would be futile. Based on the record before me, and my conclusions related to Hotch-

kins' disparate impact and harassment claims, I sincerely doubt that Hotchkins would be able to carry his burden of demonstrating a causal link between his written and alleged oral complaints to his termination by Fleet or that the true reason that Fleet fired him was because he had made such complaints, rather than because he had refused to report to work.

Because the Complaint does not contain a claim for retaliatory discharge, and leave to amend to assert such a claim would be inappropriate and prejudicial to Fleet, that claim does not exist in this action and, accordingly, it cannot be used to frustrate the pending motion for summary judgment.

## CONCLUSION

Based on the foregoing, Fleet Delivery Service's motion for summary judgment (# 24) is GRANTED.

## JUDGMENT

Based on the record,

IT IS ORDERED AND ADJUDGED that this action is dismissed.