[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON
CT Page 8689 DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
In June of 1995, the plaintiff filed a four count complaint. The plaintiff has represented that the fourth count alleging compelled self-defamation will not be pursued. Therefore, the defendant's motion for summary judgment is only directed against the first three counts. Count one alleges the plaintiff's termination from employment by the defendant corporation violated the provisions of the Connecticut Fair Employment Practices Act which prohibit discrimination against an employee based on sexual preference. The second count alleges that the defendant company intentionally inflicted emotional distress on the plaintiff and the third count claims negligent infliction of emotional distress by the defendant.
The standards to be applied in summary judgment procedures are clear. A trial court cannot grant such a motion if there is a genuine issue of material fact. Parties have a constitutional right to a trial by jury. However, if no such issue exists, litigants should not be subjected to the cost and inconvenience of continuing litigation.
First, the court will discuss the general factual background to this case.
 1.
The plaintiff was hired by the defendant company in February of 1987. He advanced in the company and, in the summer of 1991, applied for an open position of group benefits specialist in the Milford office of the defendant. The hiring manager of the Milford office, Jim McGrath, had previously worked with the plaintiff and actively recruited him for this position. The plaintiff believed McGrath knew of his sexual preference but he specifically told McGrath of his sexual preference and was assured it would not present a problem. The plaintiff was then interviewed by Steven Dillman, the office manager, and was hired in January cf 1991. While he was in the Milford office, the plaintiff was supervised by Dillman, McGrath, Jack Monnes, Tom Murray and Jim Bazzano, but he worked primarily for Mr. McGrath; his incentive compensation was to come from McGrath's accounts.
In a deposition, the plaintiff stated that almost immediately CT Page 8690 after he began work at the new assignment, salesman asked about his sexual preference. Plaintiff alleges he was excluded from social gatherings with other male employees — golf, happy hour, sporting events — although a person with the same position was not so excluded. Plaintiff never asked to be included in these functions and McGrath did invite the plaintiff to social functions before and after he started working at the Milford office. He claims salespeople spoke to him in a different tone.
After the first six months, the plaintiff claims the discrimination became more overt and the plaintiff alleged several occurrences of such dicrimination. At a 1992 staff meeting, McGrath laughingly asked if anyone in the workroom had marched in the gay pride parade the previous weekend — the plaintiff was the only openly gay person in the office. Dillman made a comment to a coworker in reference to the plaintiff and his problem with a job function that "it's a woman thing." Also, Dillman allegedly told a coworker that the plaintiff was "one of those people" and made gestrures with his wrists and fluttered his eyes — the plaintiff did not see or hear any of this, the coworker told him about the incident according to the plaintiff.
The plaintiff said he told McGrath about this latter incident but was told not to worry about it and plaintiff gathered the inference that McGrath did not believe it was a big deal.
The plaintiff received good performance evaluations and pay raises, although he claims McGrath limited his incentive earnings. The plaintiff heard from other employees that McGrath felt he was not performing well on his job but never himself said this to the plaintiff. No one said his work performance was bad and, in plaintiff's appraisal, Dillman said "overall [the plaintiff] was doing a good job." But when he inquired about advancement opportunities the plaintiff claims he was given vague answers.
The plaintiff described McGrath as being harsh with people and he felt McGrath would remove anyone who got in his way; McGrath was gruff with plaintiff as with others.
In December 1992, the plaintiff told McGrath he did not like how he was being treated and that things had to change. He said he wanted to be treated like other employees, fairly. McGrath CT Page 8691 became angry and asked what he would do if things did not change. After this discussion, McGrath appeared to back off.
Five months after the meeting with McGrath, the plaintiff was suspended and subsequently terminated from his employment for allegedly falsifying a part of one transmittal form and for alleged expense report improprieties. He was accused of falsifying names on a compensation form having solicited two workers to forge the names of the two men who were not present in the office and were required to sign the documents. The plaintiff said this had been done in the past and as to the expense accounts the plaintiff said he simply had been following McGrath's instructions.
The plaintiff had received a copy of and signed for the defendant companies; code of conduct. The code stated that falsifying records, including travel, entertainment and expense reports was violative of the code of business ethics. Employees were expected to comply with the code and report violations of the code. They were warned that violations could lead to discipline up to and including dismissal.
Certain facts should be mentioned which were not specifically articulated in the defendant's brief but were referred to in the plaintiff's brief for the purpose of rebutting the so-called same-actor defense. Under that defense to these discriminatory termination cases, it is sometimes argued that such a claim does not lie because the same person who allegedly fired the plaintiff for discriminatory reasons was the very person who had hired the plaintiff shortly before, i.e., the motive for the termination could not have been discrimination under such circumstances. The plaintiff, in an attempt to counter this defense, made a factual admission at page 13 of its brief which the defendant at oral argument maintained is critical to the viability of the whole discrimination claim apart from its relevance to the same actor defense. In its March 13, 1998 brief, the plaintiff stated:
 "However, the decision to terminate plaintiff was made by Marianne Cassidy [formerly Osbourne] in consultation with Thomas Trieber and Attorney Stephanie Middleton. . . . In fact, neither McGrath or Dillman were consulted on the decision. . . . Clearly, the individuals that hired plaintiff were not involved in the decision to terminate the plaintiff."
CT Page 8692 Mr. Trieber investigated the expense voucher matter for Cigna; he was employed by the corporate audit section of the defendant. Stephanie Middleton was an attorney in employment law for the defendant who worked in Philadelphia. Cassidy makes the decision to terminate employees in these matters in conjunction with Attorney Middleton. After he was terminated, Ms. Cassidy had a conversation with the plaintiff in which the plaintiff stated he felt he was being fired because of his sexual preference. In her deposition testimony, Ms. Cassidy said she did not know what the plaintiff's sexual preference was and it would not have made any difference in regards to his termination. McGrath, in his deposition, said he probably was consulted by a company official as to the plaintiff's performance prior to the plaintiff's termination but then retracted that statement and testified that he did not even know the plaintiff had been suspended with pay and that no one asked him for any input as to whether or not the plaintiff should be terminated. He said he learned about the reasons for the plaintiff's firing only after the termination. McGrath said he had no idea the plaintiff was being terminated. During the investigation by Trieber, Trieber called McGrath and told him he was doing an investigation and asked whether the plaintiff had taken a client out to dinner during a business trip to Boston which McGrath and the plaintiff had taken. McGrath stated to Trieber that would be highly unlikely. This was all Trieber asked him about during his investigation. McGrath had never spoke to Trieber before this.
Of the three people who reached a consensus on firing the plaintiff, Attorney Middleton worked for the defendant in a Philadelphia office, Mr. Trieber worked in an office in Bloomfield, the records does not indicate where Ms. Cassidy worked, but there is nothing to indicate she worked in the Milford office where the plaintiff was employed.
 II
The court will first discuss the motion as it relates to the first count which alleges that the plaintiff's firing violated the provisions of the Connecticut Fair Employment Practices Act which prohibits discrimination against an employee based on sexual preference.
Both sides agree that in interpreting the act our courts apply federal case law dealing with federal anti-discrimination statutes for the purpose of applying and analyzing the essential CT Page 8693 elements of a discrimination claim and whether it is viable in the summary judgment context. Board of Education v. CHRO,176 Conn. 533, 527 (1979); Pik-Wik Stores, Inc. v. CHRO,170 Conn. 327, 330 (1976); cf. Wroblewski v. Lexington Garden, Inc.,188 Conn. 44, 53 (1982); Chestnut Realty v. CHRO, 201 Conn. 350, 358
(1980).
A prima facie case of discrimination can be established either by utilizing the test formulated in McDonnell DouglasCorp. v. Green, 411 U.S. 792, 802 (1973) or the test set forth inPrice Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989). TheMcDonnell test is the test said to be used in a situation where circumstantial evidence is presented to show discrimination, while the Price Waterhouse test somewhat confusingly is called the "direct evidence" test, — i.e., "direct evidence" is used for this purpose. In Employment Discrimination, Larson, 2d ed., theMcDonnell test is called the test applicable to a "pretext case" while the Price Waterhouse test applies to a "mixed motive" case. Larson, as usual, clears up the confusion by saying:
 "Simply put, in a pretext case [McDonnell], the plaintiff seeks to show discrimination indirectly, and the defendant claims a non-discriminatory reason for its action. In mixed motive cases, [Price Waterhouse], discrimination directly and the defendant must then the plaintiff demonstrates the presence of I prove that it harbored other motives [whence the term `mixed motive'] which would have led it to the same decision, without regard to the impermissible (i.e., discriminatory] factor. [The term `pretext case' is used for the first type of case referred to by Larson because once the `defendant claims a nondiscriminatory reason for its action,' the plaintiff can try to show the reason was a `pretext.']
See Larson at § 136.02 at page 136-4. Also see for reference to same dichotomy in method of proof Wall v. Trust Co. ofGeorgia, 946 F.2d 805, 809 (CA 11, 1991); Perry v. Kunz,878 F.2d 1056, 1059 (CA 8, 1989); EEOC v. Alton Packaging Corp. , [see excellent discussion in Larson at §§ 136.02 and 136.03 at pp. 136-4 to 136- 13; Larson is discussing Age Discrimination Act but his comments on McDonnell and Price Waterhouse tests are useful.]
What creates confusion is that: "Many courts draw mixed motive/pretext dividing lines based on whether the plaintiff CT Page 8694 offers direct or indirect circumstantial evidence of discrimination. . . . [M]ore nuanced decisions differentiate not between direct and circumstantial evidence, but between evidence directly reflecting [discrimination of whatever sort] and that which permits only an indirect inference thereof." Larson at page 136.08. Or, to put it in plainer English, the McDonnell test does involve the use and analysis of "circumstantial evidence" as generally understood while, under the Price Waterhouse test, direct evidence of bias can be shown by circumstantial evidence in some circumstances.
In Griffiths v. Cigna Corp. , 988 F.2d 457, 470-1 (CA 3, 1993), the court relied on a leading Second Circuit case and said the following:
 "At least some of the courts which have allowed a plaintiff to establish a mixed motives case through circumstantial evidence recognize that such evidence must be different in kind from the circumstantial evidence supplied under the McDonnell/Burdine shifting burden analysis. For example, in Ostrowski v. Atlantic Mut. Ins. Co., 968 F.2d 171, 182 (2d Cir. 1992), the court stated that the circumstantial evidence "must be tied directly to the alleged discriminatory animus.' Thus,
 `purely statistical evidence would not warrant [shifting of burden]; nor would evidence merely of the plaintiff's qualification for and the availability of a given position; nor would "stray" remarks in the workingplace by persons who are not involved in the pertinent decisionmaking.'
 Id. Instead, the Ostrowski court suggested that a plaintiff could shift the burden to the defendant' through such evidence as `policy documents or statements of person involved in the decisionmaking or retahatory animus of the type complained of in the suit.' Id. See also Kirschner v. Office of the Comptroller, 973 F.2d at 93 (circumstantial evidence sufficient if `tied directly to' discriminatory animus)."[1]
 (a) CT Page 8695
The case now before the court is not a mixed motive case and there is no evidence directly reflecting bias in the actual decision to terminate the plaintiff. The individuals who made discriminatory remarks according to the plaintiff's allegations has nothing to do with making the decision to terminate him. The people who actually decided to terminate the plaintiff were not involved in expressing any discriminatory remarks nor is there any evidence presented to the court that discriminatory remarks were made to them by others while they were in the decision making process or that they knew such remarks or discriminatory actions were engaged in by others. Cf. LaMontagne v. Americanconvenience Products, Inc., 750 F.2d 1405, 1412 (CA 7, 1984) (direct evidence of discrimination not found even where arguably discriminatory remarks directed to decision maker by other company officers — court said relevant inquiry is decision maker's motivation.) The plaintiff cannot establish a prima facie case by use of the Price Waterhouse test.
 (b)
The fact that the plaintiff cannot resort to the so-called "direct evidence" test and Price Waterhouse does not preclude reliance on the McDonnell test as a basis to establish a prima facie case or at least the Second Circuit's variation of that test in discriminatory discharge cases:
 ". . . we have previously tailored the four elements of a McDonnell Douglas prima facie case to permit a plaintiff in a non-reduction in force case to make a prima facie showing of age discrimination without establishing that she was replaced by a younger employee. . . . Plaintiff can establish a prima facie case by showing that (1) she was in the protected age group; (2) she was qualified for the job; (3) she was discharged; (4) the discharge occurred under circumstances giving rise to an inference of age discrimination."
Montana v. First Federal S L of Rochester, 869 F.2d 100, 104
(CA 2, 1989), citing Pena v. Brattleboro Retreat, 702 F.2d 322,324 (CA 2, 1983)
The Second Circuit applies this test for a prima facie case to age discrimination and all Title VII cases. Dister v.CT Page 8696Continental Group, 859 F.2d 1108, 1114 (CA 2, 1988). It seems reasonable to follow the Second Circuit test — we are in its geographical area, disparate results in these kinds of cases would be undesirable and McDonnell Douglas is a guideline not a straight jacket.
The Chambers court discusses practical considerations involved in establishing the initial prima facie case underMcDonnell Douglas and some of the factors that should be considered because of the circumstantial nature of the evidence involved:
 "Because an employer who discriminates is unlikely to leave a "smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his [/her] claim by direct evidence, and is usually constrained to rely on circumstantial evidence. Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill the position. . . or the employer's criticism of the plaintiff's performance in ethnically degrading terms. . . or its invidious comments about others in the employee's protected group or the more favorable treatment of employees not in the protected group. . . or the sequence of events leading to the plaintiff's discharge. . . or the timing of the discharge. . . ." Id. at page 37.
At the summary judgment stage, if and when a prima facie case is established, the exercise is not quite played out; at page 38Chambers goes on to say:
 "Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing "through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action'. . . (Emphasis added by court)
Then, the court goes on to say:
 "After the defendant has articulated such CT Page 8697 nondiscriminatory reasons, the plaintiff has an opportunity to show that the reason was merely a pretext for discrimination."
And the court goes on to say, importantly, that: "Pretext may be demonstrated either by the presentation of additional evidence showing that `the employer's proffered explanation is unworthy of credence. . . or by reliance on the evidence comprising the prima facie case, without more, see St. Mary's Honor Center v.Hicks,. . . at. . . 113 S.Ct. 2742, 2749 (509 U.S. 502)." TheMcDonnell test does have a certain formalistic appeal.
However, what is important to remember in applying the burden shifting rules of the McDonnell test is that the proof scheme it sets out ". . . is designed to give judges `a method of organizing evidence and assigning the burdens of production and persuasion in a discrimination case. . . . Courts must, however, resist the temptation to become so entwined in the intricacies of the proof scheme that they forget that the scheme exists solely to facilitate determination of the `ultimate question of discrimination vel non.'" Proud v. Stone, 945 F.2d 796, 798 (CA 4, 1991) (This comment proved helpful especially after the court looked up the meaning of "vel non" — it means "or not," Black's Law Dictionary 6th ed.)
 (i)
The court must apply the Chambers analysis to this case and its facts. But before this can be done, some general comments must be made on the nature of that analysis and its requirements. Immediate problems are presented at least for the court. It must be remembered that McDonnell Douglas itself was a discriminatory failure to hire case. The various federal circuits have modified the McDonnell Douglas test for application to discriminatory discharge cases. The Seventh Circuit has stated that a prima facie case of discriminatory discharge is made out if (1) the plaintiff was a member of a protected group; (2) that the plaintiff was qualified for the job; (3) that he satisfied normal job requirements; (4) that the plaintiff was discharged; and (5after the discharge the employer assigned people not in theprotected group to do the job. Flowers v. Crouch-Walker Corp. ,552 F.2d 1277, 1282 (CA 7, 1977)[2] The Fifth Circuit adopted a combination test for the last criteria which said that "after the termination, the employer hired a person not in [the plaintiff's] protected class or retained those having comparable or lesser CT Page 8698 qualifications not in plaintiff's protected class." Whiting v.Jackson State University, 616 F.2d 116, 121 (CA 5, 1980). These variations of the McDonnell Douglas test for a prima facie case in a discriminatory discharge claim differ but they both retain the same objective quality of McDonnell Douglas which is noted by Larson to be one of the important features of that case's criteria for establishing a prima facie case. Larson notes "noteworthy omissions" in the four step McDonnell Douglas test: ". . . [there is an] omission of any reference to employee intent at the first stage, that of making the plaintiff's prima facie case. This is plainly deliberate, and is dictated by the court's determination to keep the standards non-subjective and even mechanical. Each of the four items is susceptible to objective proof." Larson, Employment Discrimination, 2d. ed. § 8.01 (1), page 8-6.
The Second Circuit test in discharge cases uses different language for its last criteria than the Fifth and Seventh Circuit. It adds an element to the McDonnell Douglas test that tan hardly be described as "objective" or mechanical in application for trial judges handling summary judgment motions. Thus, the court in Chambers said that in a discriminatory discharge case, in addition to the preliminary McDonnell Douglas
criteria, it must be shown that "(4) the discharge occurred under circumstances giving rise to an inference of age discrimination." 43 F.3d at page 37; Montana v. First Federal, supra at 869 F.2d, page 104. It is all well and good to argue, as the plaintiff correctly does, that in the Second Circuit "the burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion "at the prima facie stage is de minimis.'" Dister v. Continental Group, Inc., 859 F.2d 1219, 1221 (CA 2, 1994); cf., Viola v. Philips Medical Systems of NorthAmerica, 42 F.3d 712, 716 (CA 2, 1994). This is certainly an accurate statement of Second Circuit law. However, the fourth criteria adopted by that Circuit and for good reason applicable in our state to discriminatory discharge cases, does require trial courts at the summary judgment level to make decisions that are fact based and rely on case by case analysis. See Chambers, at 43 F.3d, page 37, headnotes 10-13, which lists a variety of "circumstances" that can lead to a permissible inference of discriminatory intent along the path of trying to determine if a prima facie case has been established.
True, every inference must be given in favor of the non-moving plaintiff as a corollary to the de minimis test. But a CT Page 8699 court must still determine under Second Circuit criteria whether any credible evidence could possibly or fairly suggest that the discharge occurred under circumstances giving rise to an inference of discrimination — this can hardly be described as a simply objective test mechanically to be applied. Thus, to say that the Second Circuit test, and by implication, our test for establishing a prima facie case of employment discrimination is a de minimis one and/or that such a burden is a "modest one," see Viola, supra at 43 F.3d page 104, is, without more, not very helpful.
 ii
With the foregoing comments in mind, the court will now apply the Second Circuit analysis as set forth in Chambers to the claims and facts of this case. As noted, the court understands that every favorable inference must be given to the claims of the plaintiff non-moving party. The first question to be asked is whether the plaintiff has made out a prima facie case. Or to put "it more exactly, given the fact that a plaintiff's burden on this score is de minimis in the summary judgment context, could any rational trier of fact conclude that a prima facie case as to the discriminatory discharge has been made out?
There is no dispute that the first several McDonnell Douglas
criteria have been established for the purposes of this motion — the plaintiff's sexual orientation placed him in a protected class, he was qualified for the position and he was discharged. The real question concerns the fourth criteria or requirement — given the discharge were there "circumstances giving rise to an inference of discrimination." Cronin v. Aetna LifeCo., 46 F.3d 196, 204 (CA 2, 1995); Chambers v. TRM Copy CentersCorp. , supra at 43 F.3d page 37.
Let us refer to some of the "circumstances" mentioned as noted in the Chambers case, id. at page 37, and determine if they can be found in this case. There was no evidence introduced here that, after the termination of the plaintiff, the employer continued to seek applicants from persons of the plaintiff's qualifications to fill the vacated position. Meiri v. Dacon,759 F.2d 989, 995 (CA 2, 1985). There has been no evidence, statistics or other data introduced to indicate that employees not in the protected group received more favorable treatment.Washington v. Garrett, 10 F.3d 1421, 1434 (CA 9, 1993). Chambers
refers to Dister v. Continental Group, Inc., 859 F.2d 1108, 1115
CT Page 8700 (CA 2, 1988) for the proposition that the timing of the discharge can provide a circumstance warranting a discriminatory inference — there the plaintiff was fired just four months before his rights in a pension plan were to vest resulting in a substantial savings to the defendant employer. Id., p. 1115. Here, just over five months after he had a confrontation with his office manager over the harassment he claims he was subjected to and after he said he might take some action because of it, he was fired. The problem with the plaintiff relying on this "circumstance" is one that haunts his claim throughout. There is simply not an iota of evidence that the team of people who actually fired the plaintiff even knew of this confrontation let alone of the harassment which was alleged to be occurring. This is not the Dister case where the very act — firing the person before rights vest which is of immediate benefit to the company — provides a basis to form the inference. Here, the firing cannot, a priori, be related to any motive that might have arisen out of the confrontation since there is no logical reason or basis in fact to transfer any motives that might have been created in low level, local management to the people in management who actually made the decision to fire. Similarly, Chambers refers to Lopez v. S.B.Thomas, 831 F.2d 1184, 1189 (CA 2, 1987), and Ostrowski v.Atlantic Mutual Insurance Companies, 968 F.2d 171 (CA 2, 1992), where invidious comments were made to a plaintiff or others in his or her protected group prior to the discharge; certainly such comments can provide a "circumstance" which, when coupled with the already established requirements or criteria, can and should establish a prima facie case — as Chambers points out, an employer who discriminates is not likely to leave a "smoking gun" attesting to discriminatory intent. 43 F.3d at page 37. But here again, the behavior the plaintiff was subjected to, which the court takes as established for the purposes of this motion, was not engaged in by anyone who the court can even speculate, let alone determine, had anything to do with the plaintiff's firing. There is nothing to indicate they even knew about it. Thus, in the Lopez case, the person who made ethnically degrading remarks was the person who actually threatened to fire the plaintiff in what was a constructive discharge case. Also, a division manager of the defendant corporation knew of the discriminatory remarks. Id. page 1189. Ostrowski is really a "mixed motive" or direct evidence case and oddly it is cited in Chambers which is a pretext case, for illustration of what may be a "circumstance" tending to show discrimination in the decision to fire. In any event, in Ostrowski, the individual making the aged bias remarks was a person who the court concluded was in the decision making CT Page 8701 process to fire the plaintiff — that person recommended the plaintiff be fired, he was a senior vice president and was responsible for evaluating the plaintiff's overall performance — he in fact had the plaintiff fired according to the court.968 F.2d at p. 173, 182, 183. That of course was not what was involved here. The individuals who allegedly made discriminatory remarks and allegedly engaged in the obnoxious and admittedly unacceptable behavior, if proven, were not the people in this company who fired the plaintiff and there is no indication they even had any input on whether this man should be terminated. As noted previously by the reference to Proud v. Stone, supra, a court must not become so involved in the intricacies of theMcDonnell Douglas proof scheme that ". . . it forget[s] that the scheme exists solely to facilitate determination of the "ultimate question of discrimination. . . ."" 945 F.2d at page 798. How could it be said or how could a rational trier of fact conclude that the circumstances surrounding this plaintiff's firing could give rise to an inference of discriminatory intent because of pre-termination harassment where the only people who did the firing have not been shown to have participated in the prescribed behavior, where there is no evidence to indicate they knew about it or even should have known about it, and no evidence presented to the court as to what if any input the discriminatory actors had in recommending termination let alone what, if any, information they communicated regarding the plaintiff prior to his termination which was or even might have been considered by the people who terminated the plaintiff? To ask the questions poses the answer. This is, after all, a discriminatory termination case. It is not a so-called "hostile environment" case. Doe v. R.R. Donnelly Sons, 843 F. Sup. 1248 (SD Ind., 1994); Waymire v. Harris County, (CA 5, 1996); Meritor SavingsBank F.S.B. v. Vinson. et al., 477 U.S. 57 (1986); or a case of constructive discharge," Ramsey v. City and County of Denver,907 F.2d 1004 (CA 10, 1990). Neither the McDonnell Douglas proof scheme or the de minimis rule of the Second Circuit permit the court on the basis of the record before it to conclude that a prima facie case of discriminatory discharge has been made out for summary judgment purposes.
This does not mean that whenever a large corporation sets up special investigatory units, separate from the day to day workplace, to determine whether a particular individual should be fired, that a prima facie case cannot be proven. Proof of disparate treatment of workers with the same history of rule violations could be offered. Washington v. Garrett, 10 F.3d 1421
CT Page 8702 (CA 9, 1993); invidious comments or disparaging ethnic, racial, gender or other discriminatory remarks by decision makers, Lopezv. S.B. Thomas, supra; Ostrowski v. Atlantic Mutual Ins. Co., supra, could be presented; in fact, any of the factors referred to in Chambers v. TRM Copy Centers, Inc., supra at 43 F.3d, page 37 (headnotes 10-13) would be relevant on the issue. Ironically, finding that a prima facie case had been made out on the facts now before the court, that is, where the evidence is not contradicted that the decisionmakers did not participate in the discriminatory remarks, did not know or have reason to know of them, and had no substantial input from the guilty parties would have a deleterious effect. Businesses would see less advantage in setting up special investigatory units separated from the ordinary command structure of a corporation — units that would be distant from the petty oppressions and more serious ethnic, racial, gender, age and sexual preference oppression that might go on in a local office and cast serious doubt on the fairness or integrity of local managers in making decisions to terminate employees: The court concludes that a prima facie case has not been established under the McDonnell Douglas scheme or, more exactly, that on the facts of this case no rational juror could so find. Summary judgment for the defendant would be warranted at this point.
But the court will assume for the purposes of discussion that its preceding analysis is mistaken and that the plaintiff has established a prima facie case and proceed with its analysis accordingly. If such a case has been established, the defendant would now have the burden of producing "`through the introduction of admissible evidence' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) Here, the defendant employer maintains the reason the plaintiff was fired was because he violated the company Code of Conduct, a copy of which he had received. Specifically, he had two secretaries forge the signatures of office managers on expense vouchers and he claimed that he took out a certain corporate customer for dinner on a business trip to Boston when in face he did not, thus invalidating his request for reimbursement of expenses. The plaintiff does not contest these allegations; he does say that he did not take out the particular person identified for dinner but took another individual out whose full name he cannot now remember. The just stated facts, according to the defendant, constituted the reasons for the termination and CT Page 8703 they do provide a non-discriminatory reason for firing the plaintiff. Dister v. Continental Group, Inc., supra at 889 F.2d, page 1115. The court cannot say that the plaintiff has shown the alleged non-discriminatory reason to terminate was so ridden with error or palpably insufficient that the defendant could not have honestly relied upon it. Lierberman v. Gant, et al., 630 F.2d 60,65 CA 2, 1980)
Once the employer has produced evidence of a non-discriminatory reason for its actions, the factual inquiry proceeds to a new level or specificity. The plaintiff retains the ultimate burden of proving that intentional discrimination rather than the employer's explanation was the true reason for firing.Viola v. Philips Medical Systems, supra at 42 F.3d, page 717. The Second Circuit in an age discrimination case has said that where a non-discriminatory reason to terminate has been provided by the employer, to defeat a properly supported motion for summary judgment, a plaintiff must "produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false and that more likely than not the employee's age was the real reason for the discharge." Woroski v. Nashua Corp. , 31 F.3d 105, 110 (CA 2, 1994). In Chambers, the court said the plaintiff has an opportunity to show that the proffered non-discriminatory reasons were a pretext. Pretext can be established by presenting additional evidence showing the employer's explanation is unworthy of belief or by reliance on the evidence comprising the prima facie case without more. The court quotes from Hicks to the effect that disbelief or rejection of the employer's reasons, particularly if there is a suspicion of lying, may with the prima facie case show intentional discrimination — in such a case no additional proof of discrimination beyond the prima facie case is required. 43 F.3d at page 38; see also Cronin v. Aetna LifeIns. Co., 46 F.3d 196, 203 (CA 2, 1995).
In any event, what is clear is that to rebut a claim of non-discriminatory reasons for the termination a plaintiff cannot rely on conclusory allegations or unsubstantiated charges actual evidence must be presented and we are beyond the mechanical finding and non-intent world at least as stated as the ideal in the McDonnell Douglas test for establishing the initial prima facie case;. . . "conclusory and unsubstantiated allegations do not provide a basis to avoid summary judgment" at this stage of the McDonnell Douglas test, Schwenke v. Skaggs Alpha Beta Inc.,649 F. Sup. 333, 338 (D Utah, 1986); there must be "objective or CT Page 8704 documentary evidence" presented contradicting the employer's assertions, Gray v. Univ. of Arkansas, 883 F.2d 1394, 1402 (CA 8, 1989), see also Simmons v. McGuffeey Nubona Harre Inc,619 F.2d 369, 371 (CA 5, 1980); the plaintiff must produce "sufficient evidence to establish that the employer's proffered non-discriminatory reason for the termination was false and a discriminatory reason was more likely than not the real reason for the discharge, Viola at 42 F.3d page 717, cf Woroski at 31 F.3d pp 109-110.
This the plaintiff may show others not in the plaintiff's protected group for similar infraction which led to the firing were more favorably treated — this would certainly show pretext, see Sorlucci v. N.Y. City Police Dept, 888 F.2d 4, 7 (CA2, 1989),Smith v. BJ's Wholesale Club, 51 FEP 1233, 1236-1237 (ND Ill. 1989). In these cases actual evidence was presented to show disparate treatment. Here a vague allegation was made in the deposition by the plaintiff to the effect that it was common practice in his office to verify expense vouchers the way he had done but no particulars were advanced to support what was therefore a vague, conclusory allegation.
Statistics can be presented showing company wide policies that foster discrimination against protected groups, McDonnellDouglas Corp. v. Green, 411 U.S. 792, 804-805 (1972), Ryther v.Kare II, 108 F.3d 832, 842 (CA8, 1997); no such evidence was presented here.
In determining whether the proffered non-discriminatory reason is a pretext courts, in fact, have also taken into consideration whether the person who decided to fire the plaintiff was involved in discriminatory statements or activity or was tainted in the decision making process by those who were. In La Montagne v. American Convenience Products Inc.,750 F.2d 1405, 1414 (CA7, 1984), the court found no basis for pretext although two company officer had made statements indicating ace bias to the company president who did the firing. The court said the president alone made the decision to terminate and there was no indication he needed the concurrence of the two officers to act even though he consulted with them, cf Simmons v. McGuffneyNursing Home, 619 F.2d 369, 371 (CAS, 1980). In Madel v. ECIMarketing Inc., 116 F.3d 1247 (CA8, 1997) the plaintiff claimed he was terminated because of his age. Several discriminatory remarks were relied upon by the appellate court to overturn the district court's granting of summary judgment. The court reasoned that CT Page 8705 these remarks were evidence that could establish the non-discriminatory reason proffered for the termination was a pretext. The court noted the person who made the remarks was a Mr. Carlson, National Sales Manager of the defendant company, and although the actual decision to terminate was made by the company president, Carlson recommended termination, id p 1249. The court appeared to regard Carlson as a decision maker as to termination, id p 1252. In Gallo v. Prudential Residential Services, LtdPartnership, 22 F.3d 1219 (CA2, 1994), an age discrimination case, the court discussed the employer's non-discriminatory reasons for the plaintiff's termination and stated that the plaintiff must be allowed to show those reasons were a pretext and the real reason was the plaintiff's age. The court said: "The identity of the person who decided the plaintiff should be discharged is a third material issue of disputed fact," id. p. 1227. The plaintiff said it was a man named Jago, a young man who hired or assigned in succession four women much younger than the plaintiff in preference to the plaintiff. The defendant on the other hand said a Ms. Toomey made the decision to terminate but the court noted although Toomey "technically" made the decision, she only did so because Jago refused to keep the plaintiff in his department, id p 1249.
Here any notion of pretext because of involvement by the people in the defendant company who decided to terminate the plaintiff in discriminatory statements or activity is not supported by anything in the record. There is also nothing to indicate that people who allegedly engaged in discriminatory activity at the office where the plaintiff worked, had any substantial input into the decision to terminate if they had any input at all.
In fact, there is nothing in the record to indicate that the reason given by the employer for the firing of the plaintiff was manufactured to avoid liability.
The court will grant the motion for summary judgment as to the first count alleging discrimination based on sexual preference.
 III
The defendant has also moved to strike the second count which alleges intentional infliction of emotional harm. Despite the narrow characterization of its own claim on this count in the CT Page 8706 introductory portions of the plaintiff's brief (See page 1 of plaintiff's 3/18/98) that the tort claim here is limited to what occurred in the "termination process", the broad factual allegations of the second count and the later argument in the plaintiff's brief at pages 27-28 give a broader basis to the claim. As the defendant's reply brief of 7/10/98 indicates the intentional infliction of emotional distress claim is based on three broad allegations (see page 2-3 of defendant's reply brief). The plaintiff in fact alleges various actions by supervisors at work that are said to constitute discrimination on the basis of sexual orientation, the conduct of a supervisor in making an allegedly openly derogatory comment about plaintiff's sexual orientation before his peers, and the act of terminating the plaintiff's employment. The court in its previous discussion has concluded that the plaintiff has not made out a prima facie case for discriminatory termination. The court will not consider that allegation in deciding this motion as it applies to the second count.
Our Supreme Court in Peytan v. Ellis, 200 Conn. 243,. 253 (1986) stated that to successfully claim intentional infliction of emotional distress the plaintiff must demonstrate:
 (1) that the actor intended to inflict emotional distress, or that he/she knew or should have known that emotional distress was a likely result of his/her conduct
(2) that the conduct was extreme and outrageous
 (3) that the defendant's conduct was the cause of the plaintiff' s distress
 (4) that the emotional distress sustained by the plaintiff was severe
The defendant's reply brief of July 10, 1998 focuses on the third requisite for this cause of action — the conduct was extreme and outrageous. The defendant claims that as a matter of law what occurred here was not extreme and outrageous; the plaintiff argues that this question should be decided by the trier of fact. The court will rely in large part on a decision it wrote in Lucuk v. Cook et al, 21 Conn. L. Rptr 377 (1998). Our court in Peytan and by its reference to Murray v. BridgeportHospital, 40 Conn. Supp 56, 62 (1984) indicates that it relies on CT Page 8707 the Section 46 requirements of Restatement (Second) Torts to define this tort and the judicial role in dealing with claims of this nature. Whether conduct claimed to be outrageous can be determined in a motion to strike or one for summary judgment can, in fact in some circumstances, be treated as a question of law — the Restatement certainly seems to think so. In comment k to § 46 it says:
 It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so. Where reasonable (people) may differ, it is for the jury, subject to the control of the court, to determine whether in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.
Following this reasoning, courts in this state and other states recognize that whether certain conduct can be regarded as outrageous can in certain instances be regarded as a question of law — even in the appropriate case permitting a motion to strike if conduct alleged in the pleadings is not deemed to be outrageous, cf Moore v. Greene, 431 F.2d 584, 592. (CA9, 1970),Pittman v. City of Oakland, 243 Cal Rptr. 306, 311 (1988). Also cf Brown v. Ellis, 40 Conn. Supp 165 (1984) where court said the question whether conduct was sufficiently extreme and outrageous is for the jury but made clear that it had made a preliminary assessment that the defendant's conduct rose to the level necessary for this cause of action. In Peytan v. Ellis, supra itself The court upheld the trial court's direction of a verdict for the defendant holding that as a matter of law it agreed "with the trial court's conclusion that the defendant's conduct could not be considered outrageous", 200 Conn. at p 254.
What about the conduct and statements in this case? The plaintiff alleges that certain derogatory remarks were made in the office where he worked over a period of time. They were not made directly to him except for one instance where one of these individuals came into a staff meeting and asked if anyone had been to the gay pride parade. The plaintiff was the only gay person in the office and the supervisor making the remark knew the plaintiff was gay. Two other comments were made by another supervisor to co-workers of the plaintiff. The plaintiff was told CT Page 8708 not to worry about it when he spoke to his supervisor about the treatment he said he was receiving. The plaintiff felt he was not invited to certain social functions and was spoken to in a different way because of his sexual preference. What do the cases say regarding these kinds of allegations and whether they can support a finding of outrageous behavior.
The cases in this area reach divergent results to say the least. Some courts hold that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to establish the tort of intentional infliction of emotional distress, Cox v. Keystone Carbon Co.861 F.2d 390, 395 (CA 3, 1988), Clark v. Township of Falls,890 F.2d 611, 623 (CA3, 1989), other courts appear to take a more liberal view, see Rinehimmer v. Luzerne County Community College,539 A.2d 1298, 1305 (Pa. 1988), and other courts seem to hold that a person's status as an employee affords him or her greater protection from insult and outrage than if she or he were a stranger to employer defendants, see discussion at Blong v.Snyder, 361 N.W.2d 312, 316 (Ia., 1984), cf also Solitari v.Smith, 812 F. Sup. 1280, 1284-87, 1296 (D.NH, 1993), interpreting New Hampshire law and holding that deliberate long term harassment enough to establish outrageous conduct — plaintiff was given written warnings and required to keep time records not required of everyone else, but see Whitehead v. A MIntern, Inc., 880 F. Sup. 1280, 1285, 1290 (ND.Ill 1994), which takes a different and more conservative approach, cf. Also DouhanBigfork School District No. 38, 805 P.2d 1354, 1362-66 (Mont., 1991) Cox v. Keystone Carbon Co., 801 F. Sup. 390, 394-97 (CA3, 1988)
The courts appear to agree that mere insults or verbal taunts do not rise to the level of extreme and outrageous conduct even when they include obnoxious activity like threats, insults or taunts McNeal v. City of Easton 598 A.2d 638, 641 (Pa. 1991) (plaintiff target of harassment and ridicule by co-workers) cfMiller v. Equitable Life Assurance Soc., 537 N.E.2d 887, 889 (Ill. 1989). Not even the more despicable activity of racial or ethnic slurs have been found to be outrageous for purposes of this tort at least when they have not been made in the presence of the plaintiff but in a more cowardly fashion behind his or her back,Bouie v. Autozone, 959 F.2d 875, 877 (CAb, 1992). Bouie as a federal court was interpreting New Mexico law.
The majority opinion in Bouie is not particularly persuasive, CT Page 8709 to this court at least, as far as the issue of whether conduct such as racial slurs should be regarded as a matter of law to not be extreme and outrageous. The dissent at 959 F.2d pages 878 et seq. argues that it should make little difference whether a supervisor made derogatory remarks behind the plaintiff's back or to his face; Section 46 of the Restatement makes no such distinction as the dissent notes, 959 F.2d at pp 882-883. The dissent argues that the majority misinterpreted New Mexico law, which it was purportedly applying, and noted that in Dominguez v.Stone, 638 P.2d 423, 427 (NM, 1981) the court of Appeals of that state held the trial court erred in granting summary judgment in a case where an employer, who was in a position of authority, uttered ethnic slurs against the plaintiff employee over a period of time. The Dominguez court itself relied on Contreras v. CrownZellenback Corp. , 565 P.2d 1173 (Wash, 1977) which involved a suit by a former Mexican employee and his wife. The Supreme Court reversed a decision of the trial court dismissing the claim for intentional infliction of emotional distress and held that when one in a position of authority has made racial slurs and jokes and other comments, the abusive conduct gives added impetus to a claim of outrageous conduct. The court went on to say that: "The relationship between the parties is a significant factor in determining whether liability should be imposed", id page 1176. The court refers to several cases and comment e of Section 46 of the Restatement (Second)of Torts.
The court believes this case is a close one; the alleged harassment here involved incidents spanning a fairly substantial period of time but they were not constant or as alleged unusually or extremely cruel although obnoxious and understandably upsetting if made. Despite this court's opinion that this tort must be strictly policed to avoid turning ordinary life and its insults and ignorant behavior into an endless and uncontrollable pool for litigation, see Lucuk v. Cook et al, supra, given this state's strong public policy as expressed in its statutes against discriminatory conduct and behavior in the work place, the court will not grant the motion to dismiss as to this count.
 IV
The defendant has filed a motion for summary judgment as to the third count of negligent infliction of emotional distress. Such an action in the employment area will only lie when a plaintiff alleges unreasonable conduct in the actual process of termination, Parsons v. United Technologies, 243 Conn. 66, 88
CT Page 8710 (1997). This has to be so in order that the exclusivity provision of the Worker's Compensation Act may be enforced, Fulco v.Norwich Catholic Diocesan Corp, 27 Conn. App. 800, 808 (1992) is still good law and indicates that injuries or damages suffered during the termination process cannot be described as a job related injury. Negligently inflicted harm arising prior to termination, as a corollary, must be work related and would be covered by the act. Thus a civil action for negligent infliction of emotional distress would only lie for actions taken by the employer in the termination process.
Here there is no evidence presented that the termination process by even the most liberal definition of that term was conducted in such a way as to have caused the plaintiff emotional distress nor was it negligently conducted so as to lead to the possibility of such a result. Mere termination cannot provide the basis for such a claim, Parsons at 243 Conn. page 88.
Summary judgment is granted as to the third count.
CORRADINO, J.